# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

CLERK'S OFFICE
A TRUE COPY
Oct 01, 2024
s/ D. Olszewski
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br>2857 N 26th St, Milwaukee, WI 53206 ("Target Location 3"), as further described in Attachment A3 | )<br>)<br>)<br>)<br>)<br>) Case No. 24 MJ 190 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A3.

located in the _____ Eastern _____ District of _____ Wisconsin _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 922(o) & 924(c); 21 U.S.C. §§ 841, 846 & 843 (b) | Unlawful possession of a machine gun; Possession of a firearm in furtherance of drug trafficking; Distribution of controlled substances; Possession of controlled substances with the intent to distribute; Conspiracy to distribute controlled substances; and Use of a communication facility to distribute controlled substances. |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jacob Dettmering, FBI SA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____ telephone _____ *(specify reliable electronic means)*.

Date: _____ October 1, 2024 _____

_____
*Judge's signature*

City and state: Milwaukee, WI

Honorable William E. Duffin, U.S. Magistrate Judge
*Printed name and title*

<u>**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT
AND SEARCH AND SEIZURE WARRANTS**</u>

Your Affiant, Jacob Dettmering, Special Agent of the Federal Bureau of Investigation, being duly sworn, depose and state that:

## I.    INTRODUCTION AND AFFIANT'S BACKGROUND

1.    I am an investigator and law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.    I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since January 7, 2018.  I was assigned to the FBI Capitol Area Gang Task Force (CAGTF) in Baton Rouge, Louisiana, from June 15, 2018, to April 1, 2020.  Since April 1, 2020, I have been assigned as the Task Force Coordinator for the Milwaukee Area Safe Streets Task Force (MASSTF).  I graduated from the FBI Academy in Quantico, Virginia, in 2018 and have over six years of federal law enforcement experience. I have been involved in the enforcement and investigation of numerous violations of federal law, to include drug trafficking investigations, firearm trafficking investigations, and violent crime related cases. I have personally conducted and participated in numerous investigations that have given me familiarity with the various methods that criminals use to conduct illicit firearm and narcotics transactions in violation of federal law. I have used investigative techniques, including but not limited to: consensual monitoring, physical surveillance, witness and subject interviews, court authorized electronic surveillance, review and analysis of telephone records, and the execution of search and arrest warrants. I have received training and have experience in the area of controlled substances investigations, money laundering, financial investigations, and various methods that drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous

1

investigations involving violations of controlled substances laws, to include violations of 21 U.S.C. §§ 841, 843(b), and 846, as well as other violations associated with the trafficking of controlled substances. I have participated in numerous drug investigations utilizing various means of investigation, including but not limited to the execution of search warrants, the use of subpoenas, and the use of informants. Additionally, I have training and experience in relation to firearm investigations, and that training and experience has been directly involved in numerous investigations involving prohibited people possessing firearms, people possessing illegal firearms including machine guns, and people possessing firearms in furtherance of drug trafficking. I have participated in firearm and narcotic investigations at the local, state, and federal levels. In addition to my experience in the investigation of individuals involved in federal criminal offenses, I also have knowledge and experience in the apprehension and prosecution of individuals involved in federal criminal offenses. I am familiar with and have experience in the use of devices used to commit those offenses as well as the available technology that can be used by law enforcement to assist in identifying the users of those devices and their locations.

3.     Based on my training, experience, and participation in drug trafficking investigations and associated financial investigations involving controlled substances, I know and have observed the following:

     a.  I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States;

     b.  I am familiar with the coded language used over the telephone to discuss drug trafficking and know that the language is often limited, guarded, and coded. I also know the various code names used to describe controlled substances;

     c.  I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in the names other than the drug traffickers, the drug traffickers actually own, use and exercise dominion and control over these assets;

d. I know large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency to maintain and finance their ongoing drug business;

e. Drug traffickers frequently possess firearms and ammunition to protect their illegal product;

f. I know it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, passbooks, letters of credit, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the traffickers within residences, businesses, vehicles, or other locations over which they maintain dominion and control;

g. I know it is common for drug traffickers to maintain books, records, receipts, notes ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. That the aforementioned book, records, receipts, notes, ledger, etc., are maintained where the traffickers have ready access to them;

h. It is common practice for individuals who are involved in business activities of any nature to maintain books and records of such business activities for lengthy periods of time. It is also common practice for individuals who maintain these records to keep them in places that are secure but easily accessible such as in their businesses, offices, or personal residence;

i. It is also common that individuals who are attempting to conceal their true income from the IRS will maintain records that will establish their true ownership of assets or other expenditures in a secret manner. These records have included bank records, automobile titles, property deeds, cashier's check receipts, money order receipts, wire transfer receipts, documents pertaining to storage facilities or safe deposit boxes, documents or agreements detailing the true ownership of assets, photographs of the true owners with the concealed assets, or other items such as sales receipts, purchase orders, or shipping invoices;

j. I know large-scale drug traffickers often use electronic equipment such as telephones, pagers, computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record, and/or store the information described in the items above, as well as conduct drug trafficking activities;

k. I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers use the following methods, including,

3

but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses that may generate large quantities of currency. To this end, I am also familiar with the analysis of financial documents;

l. I know drug traffickers commonly maintain addresses or telephones numbers in books or papers that reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

m. I am familiar with computers, cellular telephones, pagers and their uses by drug traffickers to communicate with suppliers, customers, and fellow traffickers and by those engaged in money laundering activities to communicate with their associates and financial institutions; That drug traffickers use these devices to record their transactions and aspects of their lifestyle related to drug dealing, whether in the form of voicemail, email, text messages, video and audio clips, floppy disks, hard disk drives, flash drives, CD's, DVD's, optical disks, Zip disks, flash memory cards, Smart media and any data contained within such computers or cellular telephones, electronic storage media and other settings particular to such devices; I know that such devices automatically record aspects of such communications, such as lists of calls and communications, and any particularized identification assigned to those source numbers or email addresses by the owner of the devices; and

n. Specifically, I know the following information can be retrieved to show evidence of use of the computer to further the drug trade and/or money laundering activities; Computer systems and cellular telephones, including but not limited to system components, input devices, output devices, data storage devices, data transmission devices, and network devices and any data contained within such systems; and computer media and any data contained within such media and other material relating to computer systems and the internet including but not limited to, documentation, operating system software, application or access program disks, manuals, books, brochures, or notes; and computer access codes, user names, log files, configuration files, and passwords, screen names, email addresses, IP addresses and cellular / wireless telephones, SIM cards, any removable storage devices for telephones, and any data contained therein, including but not limited to stored telephone numbers, recently called numbers list, text messages, digital audio and/or video recordings, pictures, settings, and any other user defined settings and/or data.

4. Pursuant to my official duties, I am submitting this Affidavit in support of an application for a criminal complaint, arrest warrants, and search warrants for property described in Attachments A1-A10, for violations of federal law, including violations of Title 21, United States Code, Sections 841(a)(1) (Distribution and Possession with Intent to Distribute Controlled

4

Substances), 846 (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances), and 843(b) (Use of Communications Facilities to Facilitate Controlled Substance Felonies); Title 18, United States Code, Section 922(g) (Felon-in-Possession of a Firearm); Title 18, United States Code, Section 922(o) (Possession of a Machine Gun); and Title 18, United States Code, Section 2(a) (Aiding and Abetting the Aforementioned Offenses), collectively referred to as the Target Offenses.

5.    I am currently participating in an investigation of the Williams Drug Trafficking Organization ("Williams DTO" or the "DTO") and its members and associates.  I am familiar with the facts and circumstances regarding this investigation as a result of my personal participation in this investigation, and my review of: (a) consensually recorded telephone conversations and face-to-face meetings; (b) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers; (c) information obtained from witnesses, including confidential sources; (d) administratively subpoenaed and court ordered records; and (e) Court Authorized Title III intercepts.

## II.    PURPOSE OF AFFIDAVIT

### A.    Individuals for Whom a Criminal Complaint are Sought

6.    This affidavit is being submitted in support of both applications for search warrants and a criminal complaint naming the following individuals:

|   | Name | Date of Birth |
|---|------|---------------|
| 1 | Dominique WILLIAMS | 09/07/1989 |
| 2 | Malik NICHOLS | 09/29/1996 |
| 3 | Jerald CAMPBELL | 12/27/1996 |

5

| 4 | Devin EILAND | 07/23/1996 |
|---|---|---|
| 5 | Anthony HANES | 07/09/1975 |
| 6 | Charles BROWN | 11/08/1997 |
| 7 | Andre MCKEE | 07/04/1992 |
| 8 | Chauncey KING | 05/27/1994 |
| 9 | Europe JAMES | 11/09/1998 |

**B.    Properties for Which Search Warrants are Sought**

7.    For the reasons discussed herein, there is probable cause to believe that located at and in the following properties, described in Attachments A1-A10 and collectively referred to as "TARGET PREMISES," are items that constitute evidence of the Target Offenses.

a.  4408 N 39th Street, Milwaukee, WI ("**Target Location 1**");

- 4408 N 39th Street, Milwaukee, WI is a single-story stone building with a gray shingle roof, and a west entry front door. The numerals 4408 are displayed to the left of the porch. The residence has a detached garage. A picture of the location follows below.

- Over the course of this investigation, case agents have observed multiple suspected drug transactions at this location, primarily conducted by HANES on behalf of NICHOLS, with selected suspected drug transactions occurring on August 14, 2024, and August 20, 2024. On July 3, 2024, case agents intercepted wire communications wherein NICHOLS directs HANES, a known drug customer and member of the DTO, to this location. HANES specially mentions having a "ton of bags," and describes how he was trying to obtain "woo" (cocaine). The residence's listed owner is Kathleen Nichols, believed to be NICHOLS's sister, and she is nominally using the residence as a group home. Law enforcement believes contraband and/or documentary evidence of

6

NICHOLS' drug trafficking will be located here, given NICHOLS frequent use of this location and his prolific drug trafficking.



b. 4414 N 39th Street, Milwaukee, WI ("**Target Location 2**");

- 4414 N 39th Street, Milwaukee, WI is a single-story stone building with a brown shingle roof, and a west entry front door. The numerals 4414 are displayed to the right of the door on the front of the residence. The residence has a detached garage.

- Over the course of this investigation, case agents have observed multiple suspected drug transactions at this location, primarily conducted by NICHOLS, with selected suspected drug transactions occurring on August 20, 2024, and August 28, 2024. On July 3, 2024, case agents intercepted wire communications reflecting NICHOLS efforts to secure or lock this location, suggesting NICHOLS maintains valuable items there, to include contraband and/or drug proceeds.

7



c. 2857 N 26th Street, Milwaukee, WI ("**Target Location 3**");

- 2857 N 26th Street, Milwaukee, WI is a single-story gray siding building with a gray shingle roof, and an east entry front door. The numerals 2857 are displayed above the door on the porch. The residence has a slab for parking in the rear of the residence.

- This residence is the listed address for BROWN. It was also the intended destination for a large shipment of drugs organized by WILLIAMS and intercepted by case agents in September 2024, per the Mirandized interview with the courier arrested that day (and described more fully below). Finally, on September 3, 2024, and as more fully described below, case agents observed BROWN conduct a drug transaction at this residence. Law enforcement believes contraband and/or documentary evidence of the WILLIAMS DTO's drug trafficking will be located here, given their frequent use of this location and the volume of drugs intended for this location.

8



d.  1810 W Atkinson Avenue, Milwaukee, WI ("**Target Location 4**");

- 1810 W Atkinson Avenue, Milwaukee, WI is one of seemingly four street addresses associated with a two-story brick, multi-use building with a flat roof, and a south entry front door, and north entry rear door.  The numerals 1810 are displayed above the door on the archway.  The residence seemingly has six (6) units on the second floor and one unit on the first floor with direct access to the rear stairwell.

- Case agents have interviewed a confidential source (SOI1, described in more detail below), who described how the Williams DTO utilized this location as a stash house. Per SOI1, the whole building is owned by WILLIAMS and supervision rotates among members of the DTO. Case agents have also observed multiple drug transactions at this location (on dates to include July 6, 2024; July 14, 2024; July 27, 2024; July 29, 2024; and August 19, 2024), and they have observed members of the Williams DTO exit this location with firearms. There are multiple utility subscribers using this address, but law enforcement is not currently able to difference individual "units" at the address, because there are no numbers on the doors or surrounding hallway areas. Indeed, case agents believe probable cause exists to search every unit at this address because: (i) they

9

have intercepted communications wherein this location was generally referred to as the "trap" or drug-dealing location; (ii) they have intercepted communications wherein WILLIAMS instructed NICHOLS to keep suspected drug customers on one "side", and NICHOLS agreed, indicating he was "not gonna show them" the other side; and (iii) they have intercepted communications wherein DTO members WILLIAMS and CAMPBELL reference a common key to this location, controlled by WILLIAMS and selectively given to other DTO members.



e.  1702 W Capitol Drive, Milwaukee, WI ("**Target Location 5**");

- 1702 W Capitol Drive, Milwaukee, WI is the lower-unit of a 2.5-story brick and siding building with a brown shingle roof, and a southwest entry front door. The numerals 1702 are displayed to the left of the door on the brick exterior. The residence has a detached garage associated with this unit.

- This residence is associated, per surveillance and utility records, with WILLIAMS' father. Case agents have also observed vehicles utilized by the DTO parked at this location over a dozen times, with the latest observation occurring on September 30, 2024. They have also seen WILLIAMS' father unloading items which they suspect to be drugs, given confidential source information, the proximity of this location to known DTO distribution locations, and the tactical manner in which the vehicles being unloaded are parked prior to their unloading, so as to conceal their contents. Case agents also know that WILLIAMS' father is linked on publicly available corporate records to the company that owned the van intercepted by law enforcement in Iowa with a large cache of drugs (discussed more fully below). Case agents have also observed WILLIAMS leave the group's most productive stash house (1810 W Atkinson, **Target Location 4**, which is located nearby) and return to this location. Case agents believe, based on electronic location data associated with WILLIAMS' phones and the observation of WILLIAMS' vehicles at this location, that

10

WILLIAMS splits his time in Wisconsin between this location and 3840 Highway 60, Slinger, WI (discussed below), such that records reflective of his drug trafficking are likely to be found at both locations. What's more, SOI1 has described how WILLIAMS' father, the most regular resident of this address, moves drugs using a van regularly parked at this address.



f.  4462 N 40th Street, Milwaukee, WI ("**Target Location 6**");

- 4462 N 40th Street, Milwaukee, WI is a single-story brick and siding building with a gray shingle roof, and a southwest entry side door. The numerals 4462 are displayed to the right of the door affixed to the siding. The residence has a detached garage.

- Case agents have observed multiple suspected controlled substance transactions near this location (i.e, in the alley behind it) on dates to include August 20, 2024 (twice), and they have intercepted communications reflective of drug trafficking at this location on dates to include July 21, 2024, and August 14, 2024. They have also established, through surveillance and utilities records, that this location is the residence of MCKEE, a member of the DTO, such that records and documents associated with the DTO's activities are likely to be located here. Case agents also know that MCKEE is the subject of an arrest warrant issued by Milwaukee County.



g.  4466 N 40th Street, Milwaukee, WI ("**Target Location 7**");

- 4466 N 40th Street, Milwaukee, WI is a single-story brick building with a gray shingle roof, and a southwest entry side door. The numerals 4466 are displayed above the brick on the siding, just below the gutter line. The residence has a detached garage.

- As more fully discussed below, case agents have intercepted NICHOLS explicitly providing this address to suspected narcotics customers as a location where they could complete their suspected narcotics transaction, on July 27, 2024, and August 29, 2024. What's more, MCKEE's known telephone number was recently in contact with (414) 335-8775, which is associated with the CashApp account "London Johnson." London Johnson (DOB: 2/11/1996), meanwhile, (i) is currently wanted for arrest by the United States Marshals Service; and (ii) is associated with this address in law enforcement databases.



h. 3840 Highway 60, Slinger, WI ("**Target Location 8**");

- 3840 Highway 60, Slinger, WI is a as a single-story brick and siding building with a brown shingle roof, and a west entry front door.  The residence has an attached garage. The premises also has a large outbuilding directly to the west and a barn to the north of the residence.

- This residence is associated, by surveillance and employment records, with WILLIAMS' suspected romantic partner. Case agents have also observed vehicles utilized by the DTO frequently parked at this location. WILLIAMS has frequently returned to this address after suspected drug trafficking in Milwaukee. WILLIAMS also returned to this address after flying back from California, having coordinated a drug shipment that culminated in the seizure of over 24 kilograms of cocaine. Case agents believe that WILLIAMS splits his time in Wisconsin between this location and 1702 W Capitol (discussed above), such that records reflective of his drug trafficking are likely to be found at both locations. Case agents believe, based on electronic location data associated with WILLIAMS' known phone numbers, that he last slept here on September 6, 2024, before "dropping" his phones and leaving Wisconsin, after the interception of his large drug shipment in Iowa, referenced above and discussed more fully below.

13





j.  3665 W. College Ave, #64 Milwaukee, WI ("**Target Location 10**");

- 3665 W. College Ave, #64 Milwaukee, WI is a two-story brick apartment building with a brown shingle roof, and multiple entry doors. The numerals 3665 are displayed to the side of the door affixed to the brick. Law enforcement understands that the units are delineated using numbers inside the building, including Unit #64.

- Case agents have observed CAMPBELL, a member of the DTO, leave the stash location at defined above as **Target Location 4** on several occasions with boxes, believed to contain marijuana, followed by electronic evidence placing him near or at this **Target Location 10.** Additionally, CAMPBELL was intercepted talking with WILLIAMS about going home and taking inventory. What's more, CAMPBELL has been observed via physical surveillance outside this location, and he is the subscriber for utilities at this unit. Case agents believe there will be illegal drugs, along with records and documents associated with the DTO's activities, here.

14



### III. <u>BASIS OF INFORMATION</u>

8. I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources:

    a. my experience investigating drug trafficking organizations ("DTOs");

    b. oral and written reports, and documents about this investigation that I have received from members of the Federal Bureau of Investigations, local law enforcement, and other federal law enforcement agencies;

    c. discussions I have had personally concerning this investigation with experienced narcotics investigators;

    d. physical surveillance conducted by the Federal Bureau of Investigation and local law enforcement agencies, the results of which have been reported to me either directly or indirectly;

    e. public records;

    f. telephone toll records, pen register and trap and trace information, and telephone subscriber information;

    g. statements of confidential sources;

    h. consensually recorded phone calls;

    i. controlled purchases of narcotics;

j.  court ordered precision location data ("pings") from telephone service providers; and,

k.  Court authorized Title III interceptions.

9.  Since this affidavit is being submitted for the limited purpose of securing the requested criminal complaint, arrest warrants, and search warrants, I have not included each and every fact known to me concerning this investigation or every aspect of the investigation to date. I have set forth only the facts that I believe are necessary to establish the foundation for probable cause for the requested criminal complaints and warrants. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

10.  Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

## IV.  **WILLIAMS DTO MEMBERS**

11.  Information about the Williams DTO members comes from the following sources and criminal indices: observations made during physical and electronic surveillance, analysis of phone tolls, the instillation of pen register/trap and trace devices, interviews conducted with a confidential human source, information obtained from other law enforcement officers, controlled evidence purchases, the use of a GPS tracking device, warrants obtained authorizing location data for cellphones, an interdiction traffic stop, a business check, the attempted introduction of an undercover law enforcement officer, and information generated via court ordered interceptions. Through a review of that information, the following persons have been identified. For ease of reference, summaries of their respective roles are provided below.

- **Dominique WILLIAMS** - WILLIAMS is a large-scale marijuana, cocaine, and methamphetamine dealer, who sources his product on the West Coast and distributes it

in the Eastern District of Wisconsin, using his eponymous DTO. He frequently deals drugs using Target Location 4, while staying at either Target Location 5 or Target Location 8. He has been observed conducting suspected drug trafficking transactions, and he has been intercepted, multiple times, discussing drug trafficking. He has used, among other phone numbers, the phone defined here and elsewhere as Target Telephone 3, assigned call number (262) 307-3681.

- **Malik NICHOLS -** NICHOLS is a mid-level trafficker of marijuana, cocaine, and firearms. He frequently deals drugs using Target Location 4. He has been observed conducting suspected drug trafficking transactions, and he has been intercepted, multiple times, discussing drug trafficking and firearms trafficking. He was also arrested, during the pendency of this conspiracy, with a firearm and drugs. He has used, among other phone numbers, the phone defined here and elsewhere as Target Telephone 1 and 2, assigned call numbers (262) 993-0926 and (414) 416-8334.

- **Jerald CAMPBELL –** CAMPBLELL is a mid-level trafficker of marijuana and cocaine, working with the Williams DTO. He frequently deals drugs using Target Location 4. He has been observed in possession of a firearm by case agents. He has been observed conducting suspected drug trafficking transactions, and he has been intercepted discussing drug trafficking. He has used, among other phone numbers, the phone defined here and elsewhere as Target Telephone 4, assigned call number (414) 745-1857.

- **Devin EILAND –** EILAND is a lower-level trafficker of marijuana and cocaine, working with the Williams DTO. He has been observed conducting suspected drug trafficking transactions, and he has been intercepted discussing suspected drug

17

trafficking. He has used, among other phone numbers, the phone defined here and elsewhere as Target Telephone 9, assigned call number (414) 499-6083.

- **Anthony HANES** – HANES is a mid-level trafficker of marijuana and cocaine, working with the Williams DTO. He frequently deals drugs using Target Locations 1 and 2. He has been intercepted discussing suspected drug trafficking. He has used, among other phone numbers, the phone defined here and elsewhere as Target Telephone 8, assigned call number (262) 388-1394. He is also a felon, with prior convictions for 2nd degree reckless homicide, fleeing/eluding, false imprisonment, and intimidation of victims.

- **Charles BROWN** – BROWN is a lower-level trafficker of marijuana and cocaine, working with the Williams DTO. He has been intercepted discussing suspected drug trafficking, to include a conversation with NICHOLS regarding the preparation of "crack" cocaine. He has used, among other phone numbers, the phone defined here and elsewhere as Target Telephone 10, assigned call number (470) 208-8160.

- **Andre MCKEE** – MCKEE is a mid-level trafficker of marijuana and cocaine, working with the Williams DTO. He resides at Target Location 6 and maintains Target Location 9. He has been observed conducting suspected drug trafficking transactions, and he has been intercepted discussing suspected drug trafficking, firearms trafficking, and firearms possession. He has used, among other phone numbers, the phone defined here and elsewhere as Target Telephone 7, assigned call number (414) 737-2265.

- **Chauncey KING** - KING is a mid-level trafficker of methamphetamine, fentanyl, and other drugs. He has been intercepted discussing suspected drug trafficking. He was also arrested, during the pendency of this conspiracy, with drugs. He has used, among other

18

phone numbers, the phone defined here and elsewhere as Target Telephone 6, assigned call number (414) 254-7701.

- **Europe JAMES** - JAMES is a mid-level trafficker of firearms, and a lower-level trafficker of marijuana. He has been intercepted discussing suspected drug trafficking and firearms trafficking. He has used, among other phone numbers, the phone defined here and elsewhere as Target Telephone 6, assigned call number (414) 254-7701.

## V. SOURCES OF INFORMATION

12. Law enforcement has received information concerning the illegal drug trafficking activities of members of the Williams DTO. More specifically, in September 2024, a Source of Information (SOI1) told case agents that WILLIAMS, who he knew as "Domo," operates a residence utilized for drug trafficking located in an apartment complex in the vicinity of Atkinson and Teutonia (believed to be **TARGET LOCATION 4)**. Approximately a month prior, the SOI1 reported he/she was inside the Atkinson stash house and observed firearms, marijuana, cocaine, and US currency. On another occasion, SOI1 claimed to have observed approximately $2,000,000 in US currency, 100 pounds of marijuana, and 26 kilograms of cocaine stashed in two apartments on the second floor of the Atkinson stash house. SOI1 stated that the drug traffickers inside the stash house know if anyone is approaching the building through a surveillance system and lookouts. Additionally, SOI1 stated that approximately 6 people rotate control of the location. SOI1 believes WILLIAMS has a younger brother, "Yoda," who is described as a heavyset black male with braids set in his hair and a beard. "Yoda" traffics smaller amounts of drugs and drives a white Jeep SUV with a black hood. Case agents believe SOI1 was referring to NICHOLS when he described "Yoda."

19

13.     Your affiant believes that the SOI1 is a credible person, with respect to this reporting, because SOI1 has been extensively questioned by affiant and federal law enforcement officials within the State of Wisconsin as to other individuals whom affiant is currently investigating who are involved in drug trafficking and the prohibited possession of weapons. What's more, your affiant is aware that SOI1 provided details of these drug trafficking organizations which affiant found to be truthful, reliable, accurate as well as useful in these upcoming investigations,

14.     Additionally, the SOI1's information is consistent with your affiant's knowledge of the DTO.  Furthermore, a substantial portion of the SOI1's information has been corroborated through independent investigation, information and evidence through oral and written reports, court ordered documents, physical and electronic surveillance, public records, telephone toll records, pen registers and trap and trace information, consensually recorded meetings and calls, and court authorized interception of wire communications. SOI1 is a convicted felon with more than two convictions but fewer than 10 convictions. The SOI1 is cooperating with law enforcement for consideration for a pending state case. For these reasons, your affiant believes SOI1 to be reliable.

## VI.     FACTS ESTABLISHING PROBABLE CAUSE

15.     In the section below, your affiant has attempted describe, in turn, additional select evidence against members of the DTO.

## MALIK NICHOLS

16.     Previously, during the course of this investigation, on March 26, 2024, the Honorable Nancy Joseph, U.S. Magistrate Judge for the Eastern District of Wisconsin, authorized the use of a cell-site simulator warrant to identify additional devices used by NICHOLS.  On April 3, 2024, case agents used the cell-site simulator at three separate locations where NICHOLS was present and identified cellular devices believed to be used by NICHOLS, to include **TARGET TELEPHONE**

20

**1** and **TARGET TELEPHONE 2**.  Case agents then served subpoenas to multiple service providers to identify the phone numbers used by the cellular devices identified by the canvassing cell-site simulator as being used by NICHOLS.  Verizon Wireless identified one of the cellular devices suspected to have been used by NICHOLS as phone number 602-989-5138, with a listed subscriber of Malik NICHOLS with an associated business of Royal Glorious Greens, LLC, located at the US Post Office, 5521 W. Center Street, Milwaukee, WI.  Additionally, the subpoenaed Verizon records revealed that the "home phone" listed for NICHOLS/Royal Glorious Greens, LLC, was **TARGET TELEPHONE 2**.  Finally, an open-source search of Royal Glorious Greens, LLC revealed that its registered agent was Malik Y. NICHOLS.

17.     AT&T identified the second cellular device suspected of being used by NICHOLS as **TARGET TELEPHONE 2**.  Additionally, as set forth above, NICHOLS identified the Target Cell Phone as his home phone number on his Verizon records for the 602-989-5138 number.

18.     On April 26, 2024, your affiant obtained federal search warrants for location information pertaining to the cell phone assigned number 602-989-5138 (24-MJ-106) and the cell phone assigned number 414-416-8334 (**TARGET TELPHONE 2**) (24-MJ-107), signed by the Honorable William Duffin, U.S. Magistrate Judge for the Eastern District of Wisconsin.

19.     While case agents were obtaining location information for those devices, case agents determined that NICHOLS was typically possessing all three cell phones at the same time.

20.     Additionally, since monitoring the wire communications to and from **TARGET TELEPHONE 1**, case agents have heard several conversations in which NICHOLS was speaking on **TARGET TELEPHONE 1** but there was also a telephone ringing in the background and then NICHOLS could be heard via intercepted wire communications answering a different phone and talking to unknown individuals on speaker phone about drug transactions, among other things.

21

21. Specifically, the user of the cell phone number 608-239-8215, identified as Anthony HANES, called **TARGET TELEPHONE 1** and pertinent conversations between NICHOLS and HANES regarding narcotics trafficking were intercepted. There have also been several occasions when the cell phone number 608-238-8215 has attempted to call NICHOLS on **TARGET TELEPHONE 1**, but NICHOLS did not answer. Case agents reviewing the wiretap and pen register/trap and trace data determined that after NICHOLS did not answer **TARGET TELEPHONE 1**, the cell phone number 608-238-8215, known to be used by HANES, immediately called **TARGET TELEPHONE 2**.

22. Furthermore, while reviewing toll data and pen register/trap and trace data for all three numbers, including **TARGET TELEPHONE 1** and the **TARGET TELEPHONE 2**, there are several numbers that are consistently being contacted by all three of NICHOLS' known phone numbers. Specifically, **TARGET TELEPHONE 1** and **TARGET TELEPHONE 2** both contact NICHOLS' mother, Nichole NICHOLS.

23. On July 10, 2024, the Honorable William E. Duffin, U.S. Magistrate Judge for the Eastern District of Wisconsin, signed a federal search warrant for location information pertaining to **TARGET TELEPHONE 2** (24-MJ-150). This monitoring period expired on August 9, 2024. While case agents were obtaining location information for NICHOLS' suspected devices, case agents determined that it appeared that NICHOLS was typically possessing all three cell phones at the same time. However, based upon training, experience, and the investigation to date, including the varying ranges of cell-site location data obtained from various service providers, case agents are aware that NICHOLS may not possess all three cell phones all the time and may inadvertently or purposefully leave one or more cell phone at his residence, when for example, he travels to obtain narcotics from his source of supply. Additionally, case agents are aware, based upon an intercepted

communication, that NICHOLS apparently did not pay his phone bill for the 602-989-5138 number, and case agents have not received location information for the 602-989-5138 number since July 24, 2024. They therefore believe that NICHOLS no longer utilizes the device assigned 602-989-5138.

24.     On or about July 27, 2024, at approximately 6:10 pm, NICHOLS received a phone call on **TARGET TELEPHONE 1** from WILLIAMS, utilizing 747-955-6842 (**TARGET TELEPHONE 3**).  WILLIAMS tells NICHOLS not to have anyone in the trap (which your affiant knows is common slang for a location involved in drug trafficking) and to keep them on the left side. An approximate summary is set forth below.

> **NICHOLS**:     Hello?
>
> **WILLIAMS:**   Yeah.
>
> **NICHOLS**:     I got it, I'm at the trap.
>
> **WILLIAMS**:   Man. Don't...everybody don't need to be in there right now. [OV]
>
> **NICHOLS**:     Alright, I know. Everything over there. Just pull out a box. Box at a time.
>
> **WILLIAMS**:   No.
>
> **NICHOLS**:     Or...
>
> **WILLIAMS**:   [UI] same on the other side. He gonna meet you over there. [UI] stayin' on the left side.
>
> **NICHOLS**:     Okay.
>
> **WILLIAMS**:   [UI] put everything on the right side. Yo I'm finna count everything.
>
> **NICHOLS**:     Alright.
>
> **WILLIAMS**:   Aight. He finna pull up. So wait til he pull up to go carry shit in the house.
>
> **NICHOLS**:     Already got Dez [PH] and [UI] wit me, bro.

23

**WILLIAMS**: Huh?

**NICHOLS**: Imma just wait.

**WILLIAMS**: I don't want them seein' the other side, you know.

**NICHOLS**: I know, bro. I'm not gonna show them the other side, G. No nobody. So nobody gonna know, bro.

**WILLIAMS**: Trust nobody. [UI] nobody needa see that shit [OV]

**NICHOLS**: Alright.

25.     On or about August 29, 2024, at approximately 6:46 pm, NICHOLS received a phone call on **TARGET TELEPHONE 1** from an Unknown Male (UM), utilizing 414-210-9268. The UM asks NICHOLS where he is and tells NICHOLS that he wants a half. NICHOLS tells him that he is on 40th and Ruby and he should pull up. A summary is set forth below.

**U/M**: What it do ?

**NICHOLS**: What's the word?

**U/M**: where you at?

**NICHOLS**: Right here on 40th and Ruby

**U/M**: Alright I just want a little half again, I'll pull up closer.

**NICHOLS**: alright

26.     Approximately three (3) minutes later, the UM calls NICHOLS again and asks which side of 40th, while advising that he is on the Congress side of 40th. NICHOLS replies with the address, 4466 N 40th Milwaukee, WI, previously defined as **TARGET LOCATION 7**. A summary is set forth below.

**U/M**: Which side I'm on the Congress side

**NICHOLS**: Yeah, the address is 4466 N 40th.

24

27. On September 14, 2024, at approximately 22:56hrs, Milwaukee Police Department (MPD) conducted a traffic stop of a white Toyota Camry bearing Florida registration [BN96AE] for failure to stop for a solid red traffic light at the intersection of N 31st Street and W Capitol Drive. The Camry was operated by MALIK NICHOLS (XX/XX/1996). During the traffic stop, a large clear plastic bag containing a green leafy substance located on the floorboard behind the front right passenger seat was observed in plain view. NICHOLS was placed into custody and officers conducted a search incident to arrest, discovering a small black digital scale in NICHOLS' front right pant pocket. A search incident to arrest was conducted of NICHOLS' vehicle and a small army green satchel was located on the driver's seat containing a white powdery substance. Additionally, a black Glock 27 .40, bearing Serial #: PBG544 was located beneath the window line of the driver's door and a small, opened box containing small plastic sandwich bags on the rear right passenger seat. Multiple multi-colored designer bags were located on the front right passenger seat and the large clear plastic bag containing suspected marijuana was recovered from behind the front right passenger seat on the floorboard. Additional small clear plastic bags containing white and purple powdery substances, which field tested positive for cocaine, were located.

**DOMINIQUE WILLIAMS**

28. The previously mentioned authorized interceptions have demonstrated that WILLIAMS and his associates are engaged in the distribution of controlled substances, including cocaine, methamphetamine, and marijuana. For instance, on August 11, 2024, law enforcement intercepted WILLIAMS, using his previous line of 747-955-6842, speaking with Chauncey King. King asked WILLIAMS, "You'll sell me a zip of Meth?" WILLIAMS said, "Say it again." King repeated, "You'll sell me a zip of the Meth?" WILLIAMS asked, "You said what?" King said, "A zip of the Meth." WILLIAMS replied, "Yea, I want a 100 if you don't buy the pound for 1200."

25

KING stated, "Aight, bring me a zip." In addition to these interceptions related to drug trafficking, law enforcement has observed WILLIAMS at his suspected stash house in the Eastern District of Wisconsin. They have also intercepted conversations wherein WILLIAMS discusses both cash payments and robberies, both believed to be associated with controlled substances.

29.     Based upon the location information associated with 747-955-6842, WILLIAMS' previous number, case agents believe that WILLIAMS flew from Chicago O'Hare International Airport to Los Angeles International Airport on August 19, 2024. And based upon that same location information, it appears that WILLIAMS stayed in that District until September 5, 2024.

30.     On August 24, 2024, at 9:26 p.m. 747-955-6842, WILLIAMS' previous number, received an incoming call from 310-503-0839, used by an unidentified female ("UF") (subsequently believed to be identified as Alysa PEIFER). WILLIAMS said, "Hello?" UF asked "Hey, what you doing?" WILLIAMS said "Shit, at the crib." The UF asked: "Oh, did you still need your house cleaned?" WILLIAMS responded: "Probably tomorrow." The UF said: "Oh fuck. I can't tomorrow, but the next day I can, Monday. Okay, umm I'm at work but I'll see what you needed." WILLIAMS respond, "Alright." The UF asked, "Also, I have people that want to go… Why what's up with Tae or you or anyone?" WILLIAMS asked: "You wanna drive?" The UF then asked, "How far would it take along?" WILLIAMS responded, "A day." The UF questioned: "One day?" WILLIAMS replied: "Yeah." The UF then asked, "Uh, would I be driving with just weed or something else?" WILLIAMS asked, "What?" The UF responded: "Weed or something else?" WILLIAMS asked, "You calling me, how you calling me?" The UF said: "Hold on," and the call abruptly ended. Based upon their training, experience, and the investigation to date, case agents believe that when the UF started asking WILLIAMS if she would be transporting "weed or something else," meaning another type of controlled substance, that WILLIAMS asked how she was calling him and then she hung up

because she was calling him on a regular phone call. I believe that the UF then hung up so she could call WILLIAMS back using an encrypted platform or a platform that cannot be intercepted by law enforcement such as Facetime. Therefore, based upon their training, experience, and the investigation to date, case agents believe that WILLIAMS and the UF were discussing driving controlled substances, i.e., "weed or something else," (meaning other types of controlled substances) from California to the Eastern District of Wisconsin.

31. On August 26, 2024, at approximately 3:29 p.m., WILLIAMS, using his former number of 747-955-6842, received an incoming call from 310-503-0839, believed to be used by PEIFER. Set forth below is an approximate transcription of the call:

> **WILLIAMS**: What's up?
>
> **PEIFER**: What's up?
>
> **WILLIAMS**: Where you at?
>
> **PEIFER**: I'm at work.
>
> **WILLIAMS**: I thought you was coming to clean my house today?
>
> **PEIFER**: I was but I'm fucking irritated, this shit with you and Tae doing this weird shit to me is irritating.
>
> **WILLIAMS**: What is you talking about?
>
> **PEIFER**: You know what happened with Tae, your with him.
>
> **WILLIAMS**: I'm not with Tae, fool.
>
> **PEIFER**: Well, shits weird, you're not gonna ask me, hey can you get me a girl for this day and then I give him a girl he says ok, make sure she can do this time and this time and make sure she calls off work, get her right and tell him, Ok do I send the money and as soon as its time for me to send the money he goes, just send me her number, I send him the number then, then he says thanks twin, I don't need you now. That's fucked up, that's weird ass shit, I'm over it. I'm not helping you guys make millions of dollars when I'm making

27

zero.

WILLIAMS: [UI] I told you I was gonna have you come to my city.

PEIFER: Yea, that shits not cool, its not fucking right.

WILLIAMS: I don't work that way, you know I don't.

PEIFER: Like that's, he went to her, and he was like I'm contacting her now, thanks twin, I don't need you. Bro I didn't put you together with her for you…

WILLIAMS: What is you talking about?

PEIFER: With the girl that is gonna go tomorrow, and now I'm making zero off of it because he went behind my back, it's weird.

WILLIAMS: Who?

PEIFER: He's having Jada go.

WILLIAMS: I don't even know who that is.

WILLIAMS: You think the niggas who robbed me getting away with that shit?

PEIFER: Of course not, but that's you, like jaded, like crazy.

PEIFER: Ok, well you're not helping.

WILLIAMS: You could come to my city, [UI].

PEIFER: I'm down I would have to leave this Saturday night and be back on Tuesday morning.

WILLIAMS: [UI] Saturday night.

PEIFER: I didn't hear you what you say?

WILLIAMS: Amen to that, we finna get up out of here.

PEIFER: Well I have to go Saturday, I have work and I can't miss a day with my promotion right now.

WILLIAMS: Well, after I finish getting all of this stuff, I'm leaving.

PEIFER: Can I meet you there Saturday to help work and do some stuff out

28

there?

**WILLIAMS**: No no no.

**PEIFER**:     Why?

**WILLIAMS**: Cuz it don't work like that.

**PEIFER**:     Huh?

**WILLIAMS**: Once I get there I ain't gon need no help.

**PEIFER**:     Bro, ok then you're not gonna help me.

**WILLIAMS**: That's what I'm saying so we gon leave probably tomorrow.

**PEIFER**:     I can't.

**WILLIAMS**: I don't give a fuck talking about you can't, that shit ain't paying you no money, you need $8,000 right?

**PEIFER**:     Yes.

**WILLIAMS**: Alright then, I'mma get you closer to it.

**PEIFER**:     Ok, I'll figure out who can cover my shifts I guess, can I come clean for $500 today?

**WILLIAMS**: My shit ain't even $500 worth cleaning, all my shit is clothes. Hold on 2 seconds, let me call you back.

32.     Based upon my training, experience, and investigation to date, case agents believe that on the intercepted call with WILLIAMS, using 747-955-6842, on August 26, 2024, was speaking with PEIFER regarding potentially transporting controlled substances with or on behalf of WILLIAMS from California to the Eastern District of Wisconsin, in exchange for money ("closer" to the $8,000 needed to pay her bills).  Additionally, during the call, WILLIAMS states, "we gon leave probably tomorrow," meaning that the trip from California to the Eastern District of Wisconsin, transporting an unknown quantity of controlled substances, may begin "tomorrow," that is, August 27, 2024.

29

33.     On September 5, 2024, case agents discovered WILLIAMS was travelling from Santa Ana, CA to Chicago, IL via a United Airlines flight.  WILLIAMS arrived at Chicago O'Hare airport and, utilizing 747-955-6842, called Jasmine GRAY via 414-567-5454 to have her send him an Uber to get him to his residence at 2857 N 26th Street, Milwaukee, WI.

34.     Once WILLIAMS arrived at his residence located at 2857 N 26th Street, Milwaukee, WI, he entered a vehicle and immediately travelled to 3840 Highway 60, Slinger, WI.  Once WILLIAMS was there, he called Jasmine GRAY again, which investigators believe was to let her know that he arrived.

35.     The same day, case agents conducted a search of the license plate reader system, looking for WILLIAMS' black Mercedes sprinter van, which case agents believed would be transporting illegal substances back to Milwaukee.  The van was captured on one of the cameras in Las Vegas, Nevada after it was captured in California the days before.

36.     Case Agents contacted the Iowa State Police to conduct a "walled off" traffic stop of the vehicle while it was travelling through Iowa on Interstate 80.  On September 6, 2024, the Iowa State Police witnessed the vehicle travelling east towards Wisconsin and observed several traffic violations.  The vehicle was stopped. A narcotics detection canine was deployed and subsequently alerted for the presence of narcotics in the vehicle.

37.     The driver was removed from the vehicle and the search yielded approximately 24 kilograms of cocaine, 74 pounds of methamphetamine, and a loaded handgun near the driver, who was identified as Dromynique CHESTNUT. Certain of these substances are depicted below. CHESTNUT on scene provided a phone number of 213-712-2423.  Case agents reviewed the pen register data for 747-955-6842, WLLIAMS' phone at the time, and found several interactions with CHESTNUT via the number provided.



38.     CHESTNUT told investigators that he was paid by Domonique WILLIAMS to drive his van from his apartment located at 15 MacArthur Place, Santa Ana, CA to 2857 N 26th Street, Milwaukee, WI, previously defined as **TARGET LOCATION 3**. CHESTNUT was told that the boxes located within the vehicle were full of designer clothing. CHESTNUT provided 747-955-6842 as the phone number he had for WILLIAMS.

39.     After CHESTNUT's arrest on September 6, 2024, through the morning hours of September 7, 2024, WILLIAMS attempted to contact CHESTNUT a total of 46 times from both of his known phone numbers, including 747-955-6842.   Shortly after, on September 8, 2024,

WILLIAMS' phone stopped making phone calls or messages outbound. Investigators believe that WILLIAMS switched phone numbers and devices after his drugs were recovered by police.

40.     Case agents further believe they have identified WILLIAMS' new number using "common call" analysis. To wit: officers analyzed the most frequent contacts for the prior numbers WILLIAMS had utilized, from 8/13/2024 through 9/13/2024. By comparing the toll records for those numbers before and after 9/7/2024—the approximate date they believe WILLIAMS "dropped" his phones—they identified a common number: Target Telephone 3, (262) 307-3681. This suggests to Case Agents—based on their experience, knowledge of this investigation, and understanding of common communication patterns among drug traffickers— that WLLIAMS new number is Target Telephone 3, (262) 307-3681.

### JERALD CAMPBELL

41.     On July 29, 2024, NICHOLS and CAMPBELL were both observed at 1810 W Atkinson Avenue, Milwaukee, WI. Investigators know NICHOLS and CAMPBELL to operate a narcotics/marijuana stash location on the second floor of the building. CAMPBELL was observed entering the white rear door to the residence which leads to an internal stairwell to the second floor. NICHOLS was observed in the parking lot interacting with two unidentified black males who appeared to solicit clothing and miscellaneous items for sale. During their interaction with NICHOLS, NICHOLS conducted an outgoing phone call (Call Session 5426) at 17:11 to **TARGET TELEPHONE 4**, which is believed to be utilized by Jerald CAMPBELL. CAMPBELL answered the phone, "Hello?," and NICHOLS asked CAMPBELL if he wanted "some white T's, you want some large white T's?". CAMPBELL responded, "You know I don't wear no damn large." NICHOLS asked, "What you wearing… medium?" and CAMPBELL stated, "Medium and smalls." NICHOLS was observed purchasing white T-shirts from the unidentified males with US currency

and small corner cut-baggies containing a white substance, which case agents believe to have been controlled substances.



42.     Following this intercepted wire communication, case agents reviewed recorded calls conducted by Jerald CAMPBELL while he in custody in the Milwaukee County Jail Facility (CJF). Case agents identified CAMPBELLS' recorded CJF call on 02/26/2019 at approximately 16:09PM and noted the similarity of the voice to the male intercepted on **TARGET TELEPHONE 1,** who had used **TARGET TELEPHONE 4**.

43.     Additionally, on July 30, 2024, static surveillance observed CAMPBELL at 1810 W Atkinson Avenue, Milwaukee, WI, known by case agents to be a narcotics/marijuana stash location. CAMPBELL exited the building carrying a large black duffel bag, believed to contain controlled

substances, and a small brown shoulder bag along with a pistol equipped with an extended magazine tucked into the right side of his waist band. CAMPBELL also carried two phones and a set of keys in his hands. CAMPBELL walked to the driver's compartment of the Toyota Highlander he regularly utilizes and dropped the duffle bags to the ground. Prior to CAMPBELL opening the door of the Highlander, a controlled phone call to **TARGET TELEPHONE 4** was successfully completed when CAMPBELL immediately looked at one of his phones and answered it. CAMPBELL was observed holding the phone to his ear utilizing his shoulder while he continued to walk around. During the controlled call, CAMPBELL stated that he just got his phone number and confirmed the phone number called during the controlled call (414-745-1857). During the call, CAMPBELL placed the duffle bag in the driver's side rear compartment and closed the rear door to the building, eventually returning to the driver's compartment of the Toyota Highlander. The call then concluded.



44. Furthermore, while reviewing toll data and pen register/trap and trace data for

**TARGET TELEPHONE 1**, **TARGET TELEPHONE 3**, and **TARGET TELEPHONE 4**, law enforcement noticed there are several "common contacts": numbers that are consistently being contacted by all NICHOLS, WILLIAMS, and CAMPBELL's known phone numbers. Specifically, **TARGET TELEPHONE 1**, **TARGET TELEPHONE 3**, and **TARGET TELEPHONE 4** all contact the same customer who regularly orders drugs from NICHOLS. Additionally, **TARGET TELEPHONE 1**, **TARGET TELEPHONE 3**, and **TARGET TELEPHONE 4** all contact Andre MCKEE, a suspected drug trafficker working in concert with the WILLIAMS Drug Trafficking Organization.

45.     CAMPBELLS' drug trafficking habits have been established by virtue of previously mentioned and authorized interception of **TARGET TELEPHONE 1** and static surveillance. Additional examples follow.

46.     On August 2, 2024, NICHOLS and CAMPBELL were observed at 1810 W Atkinson Avenue, Milwaukee, WI, known by case agents to be a narcotics/marijuana stash location. At 16:05, CAMPBELL arrived in a black Toyota Highlander and parked in the northwest corner of the lot, facing east. At 17:46, CAMPBELL walked into view from the northwest corner of the lot and lingered in the parking lot with a firearm tucked under his left armpit. CAMPBELL held two phones and appeared to be talking to someone on one of the phones. NICHOLS departed the location. At 18:15, a white Lexus SUV bearing WI plate [ANE9007] parked in the parking lot of 1810 W Atkinson. At 18:22, CAMPBELL entered the rear white door of 1810 W Atkinson. At 18:36PM, CAMPBELL exited the rear white door carrying a cardboard moving box into the northwest corner of the parking lot to the vicinity of the Toyota Highlander. At 18:38, CAMPBELL walked southeast bound across the parking lot from the northwest side, carrying a cardboard moving box. Campbell accessed the front passenger door of the white Lexus SUV. Campbell conversed with the occupant,

35

leaving the cardboard box in the front passenger area and holding an amount of US currency in his left hand. Shortly after the interaction with the CAMPBELL, the white Lexus SUV departed the location. At 18:51, CAMPBELL departed in the black Toyota Highlander.

47. On August 3, 2024, CAMPBELL and NICHOLS were observed at 1810 W Atkinson Avenue, Milwaukee, WI, a previously mentioned narcotics/marijuana stash location. At 12:06, NICHOLS and CAMPBELL exited the rear white door of the building. CAMPBELL carried a clear plastic bag of suspected marijuana under his left arm. Simultaneously, a blue Explorer bearing WI registration [AWZ 6988] travelled southbound on N 18th Street, parking on the west side of the street just south of the parking lot entrance. A black male (UM1), approximately 30-40 years of age, wearing a black t-shirt, dark colored sweatpants, and dark shoes, exited the driver's seat and walked west toward the vicinity of NICHOLS and CAMPBELL. At 12:08, the UM1 walked eastbound back to the vicinity of the Ford Explorer, which departed southbound on N 18th Street. NICHOLS and CAMPBELL walked from the west side of the parking lot to the open rear white door. CAMPBELL no longer carried the bag of suspected marijuana, but the left side of his waistband jutted out and his shirt was pulled over what appeared to be the outline of a handgun magazine. NICHOLS and CAMPBELL entered 1810 W Atkinson, closing the rear white door behind them.

48. On August 3, 2024, at 13:20, a white Honda Accord with heavy window tint, bearing WI registration [AEW4476] travelled southbound on N 18th Street, turning into the parking lot of 1810 W Atkinson parking facing south near the rear white door. At 13:25, CAMPBELL exited the rear white door of 1810 W Atkinson carrying a full black plastic grocery size bag in his left hand and a black handgun under his left armpit. CAMPBELL accessed the front passenger compartment of the Honda Accord and placed the black bag inside the vehicle. CAMPBELL conversed with the occupant(s) and withdrew his left hand, holding an amount of US currency with $100 denominations

36

visible.  At 13:29, CAMPBELL closed the front passenger door of the Accord and re-entered the rear white door.  The Accord departed, travelling southbound on N 18th Street and westbound on W Atkinson Avenue.



49.     Based upon my training, experience, and investigation to date, I believe that CAMPBELL's interactions with the occupant(s) of vehicles in the above-mentioned instances to be suspected transactions of unknown controlled substances.  On two of the occasions CAMPBELL transacted suspected controlled substances contained within a cardboard box (Aug. 2) and a black plastic grocery bag (Aug. 3) in exchange for US currency observed in CAMPBELL's possession immediately following the interactions.  Immediately leading up to the interaction on Aug. 3 with the UM1, CAMPBELL carried a clear plastic bag of suspected marijuana under his left arm.  The brevity of the interaction, the historical knowledge regarding 1810 W Atkinson, and the nature in

37

which the interaction was conducted lead case agents to believe these three interactions to be suspected drug transactions.

50.     On August 17, 2024, at approximately 3:56 pm, WILLIAMS placed an outgoing call to CAMPBELL via **TARGET TELEPHONE 4**.  CAMPBELL could be heard telling WILLIAMS that he was being watched for about 6 months.  A summary is set forth below.

|  |  |
|---|---|
| **WILLIAMS**: | Where you at (UI)? |
| **CAMPBELL**: | Dropping the kids back off (UI) trying to get some shit together |
| **WILLIAMS**: | (UI) |

*(Background chatter)*

|  |  |
|---|---|
| **WILLIAMS**: | What? You talking to me? Hello? |
| **CAMPBELL**: | Have been watching you for like six months |
| **WILLIAMS**: | Who said that? |
| **CAMPBELL**: |  I got out there to meet with them |
| **WILLIAMS**: | Listen I need you to get some shit together for Zo. You hear me? |

*(Background chatter)*

|  |  |
|---|---|
| **CAMPBELL**: | Talking to Chicken bro. Cuz you gotta call your guys bro I ain't gonna lie bro. Oh some hating ass bitch ass shit I ain't gonna lie bro. |
| **WILLIAMS**: | Who? Who? |
| **CAMPBELL**: | Hello |
| **WILLIAMS**: | Who? |
| **CAMPBELL**: | Trying to lie I ain't gonna lie bro. |
| **WILLIAMS**: | Who? |

38

| CAMPBELL: | Man he finna call me and tell me who right now but you know I be with bro like we do shows together all type of shit bro don't have nothing to do with that shit with bro. He don't even fuck with dude bro they trying to. Bro they got the key fobs to the nigga benz bro. He get wind of it drop the benz they on 24th and locust right now talking about it bro find out we gotta find out who telling who talking. They trying to back door the nigga. They on some hating ass gay ass shit them niggas gay. I stay out the way. |
|---|---|
| WILLIAMS: | Cuz |
| CAMPBELL: | What up cuz? |
| WILLIAMS: | I need you mizo some shit. How long you gonna be? |
| CAMPBELL: | I'm on my way there now I was dropping my son of at his grandma's house. I got a play. Got 4 5 g's on the floor. |

51.     On August 19, 2024, at approximately 13:50pm, NICHOLS, using (262) 993-0926, received an incoming call from Ishmael Ali-Darr, using (414) 745-4827.

| NICHOLS: | What you on. East Capitol? . |
|---|---|
| U/M: | Uh, hell yeah. Getting off on East Capitol. 76A. |
| NICHOLS: | You said what? |
| U/M: | Getting off on East Capitol. Exit 76A. |
| NICHOLS: | Oh yeah. You on Green Bay and Cap. |
| U/M: | Yeah. Right here brudder. |
| NICHOLS: | Come to, come to 18th. |
| U/M: | 18th and Cap. Alright. By what? What's over there? Like the uh, Za Zas |
| NICHOLS: | And then you're gonna make a left. |
| U/M: | Where, where Za Zas at, make that left? |

39

**NICHOLS**:     18th and Capitol. Make a left.

**U/M**:         Alright. I got ya brudder. I can be there in 5 minutes.

52.     At approximately 13:54pm, NICHOLS traveled southbound on N 18th Street in a Tacoma pickup truck parking on the west side of N 18th St facing south. Moments later, a black Mercedez Benz GLA SUV bearing Wisconsin registration [AVP-6600], VIN# WDCTG4GB5KU006874, listing to Izariah Ali (DOB: 6/15/01) to the address of 8604 N Servite Dr, arrived from the north and parked directly in front of NICHOLS' vehicle. After parking, a black male wearing a black hooded sweatshirt, black shorts and sandals exited the drivers compartment of the Mercedez and entered the rear passenger side compartment of the Tacoma. At approximately 1:59pm, NICHOLS and the unknown black male exited the vehicle simultaneously and met on the sidewalk, shaking hands. The unknown black male entered the drivers compartment of the Mercedez and departed the location while NICHOLS walked towards the rear door of 1810 W Atkinson Avenue. At the same time, CAMPBELL exited the rear door of 1810 W Atkinson Avenue and shook hands with the driver of the Honda Accord before opening the drivers' door of the Chevrolet Silverado. CAMPBELL stood in the doorway of the Chevrolet Silverado while manipulating an object on the driver's seat. CAMPBELL then carried an approximate quarter pound amount of suspected marijuana contained in a clear bag and handed it to the driver of the Honda Accord.

53.     At approximately 14:00pm, CAMPBELL and NICHOLS interacted near the driver's door of the Chevrolet Silverado. NICHOLS was observed wearing a black "evolution" graphic t-shirt, black adidas long shorts, wearing a cross-body satchel and hair tied up in multiple buns. CAMPBELL was observed carrying a black firearm under his left armpit, pinned to his body with his left arm.



54.     At approximately 14:02pm, CAMPBELL departed 1810 W Atkinson Avenue in the Chevrolet Silverado while NICHOLS entered the rear door while conducting a phone call.  At approximately 14:06pm, NICHOLS exited the rear door of 1810 W Atkinson Avenue carrying a large heavy cardboard box.  NICHOLS placed the box in the rear passenger compartment of the Toyota Tacoma after adjusting the front passenger seat.



**EUROPE JAMES**

55.     Case agents, after they began monitoring the wire communications to and from

**TARGET TELEPHONE 1**, intercepted wire communications to and from EUROPE JAMES' phone assigned 414-748-1145 (**TARGET TELEPHONE 5**). Case agents checked law enforcement databases and were familiar with the historical listing of **TARGET TELEPHONE 5** to "James, Europe M" at the address 6434 N 106th St, Milwaukee, WI 53224. Additionally, **TARGET TELEPHONE 5** is associated with a CashApp account named "Huncho," with the handle $HunnitGz.

56.     A search of the Wisconsin Circuit Court Access (CCAP) revealed JAMES has previously pled "no contest" to the offense of carrying a concealed weapon and has a listed address of 6434 N 106th St, Milwaukee, WI 53224.

57.     On July 12, 2024, at approximately 09:59hrs, NICHOLS, using **TARGET TELEPHONE 1**, received an incoming call from **TARGET TELEPHONE 5**, believed to be utilized by JAMES. The conversation is summarized below.

> **NICHOLS**:   Hello?
>
> **JAMES**:     Hey bitch, I'm outside I need a half.
>
> **NICHOLS**:   Bitch I ain't got no smoke, I hope you paid attention to your text messages.
>
> **JAMES**:     The hell? You text me? Bro you just fucking texted me Malik bro!!
>
> **NICHOLS**:   What the fuck nigga you got my low but I ain't tell you to pull up!
>
> **JAMES**:     Bro I got your low from your pull up. What the! *Laughs* We bout to go get some smoke together nigga you got me fucked up. It's time to go to the shop, We about to go to the store together... fuck that! Who got some weed bro?
>
> **NICHOLS**:   I don't know I been waiting on Pape to get me weed.
>
> **JAMES**:     Where his bitch ass been at?
>
> **NICHOLS**:    I don't know, bro they been low bro.

| JAMES: | Domo ass still gone? |
|---|---|
| **NICHOLS**: | No. |
| **JAMES**: | There go them boys... |
| **NICHOLS**: | Ay what you doing around 11 o'clock, 10:30? |
| **JAMES**: | Uhhh shit, what's the word... It's 10 oclock right now Malik. |
| **NICHOLS**: | I mean like 10:30. |
| **JAMES**: | Shit, like what up? I gotta work today at 3:00 but shit I ain't doing shit till then. |
| **NICHOLS**: | I gotta pick go pick up my rental at a 11. |
| **JAMES**: | You need a ride? |
| **NICHOLS**: | Yeah. |

58.     Based upon their training, experience, and the investigation to date, case agents believe this conversation reflects JAMES requesting 14 grams, or "a half," of marijuana ("smoke" / "weed") from NICHOLS.  NICHOLS stated that he was out of marijuana and was waiting on JERALD CAMPBELL ("Pape") to resupply him with marijuana ("weed").  JAMES asked if DOMINIQUE WILLIAMS ("Domo") was still out of town.  NICHOLS proceeded to ask JAMES for a ride to pick up his rental vehicle.  Case agents know NICHOLS to obtain and utilize various rental vehicles for use during his mobile drug dealing.

59.     On July 15, 2024, at approximately 21:31hrs, NICHOLS, using **TARGET TELEPHONE 1**, received an incoming call from **TARGET TELEPHONE 5**, believed to be utilized by EUROPE JAMES. A summary is set forth below.

| JAMES: | What you doing cuz? You got some more smokes? |
|---|---|
| **NICHOLS**: | Yup |
| **JAMES**: | Where you at, want me to pull on over there? |

| NICHOLS | : | Yup |
|---|---|---|
| JAMES | : | You got that zap on you? |
| NICHOLS | : | Yup I gotta get some some baggies bro |
| JAMES | : | You said to grab you some baggies? |
| NICHOLS | : | Yeah |
| JAMES | : | Alright |

60.     Based upon their training, experience, and the investigation to date, case agents believe this conversation reflects JAMES requesting approximately an ounce ("zip") of marijuana ("smoke") from NICHOLS.  NICHOLS and JAMES discuss a meet location for the suspected drug transaction.  NICHOLS directed JAMES to pick up more "baggies," which case agents believe to refer to small Ziploc baggies for the packaging of controlled substances.

61.     On August 21, 2024, at approximately 21:22hrs, NICHOLS, using **TARGET TELEPHONE 1**, received an incoming call from an Unknown Male, using 414-406-9767.  An approximate summary is set forth below.

| NICHOLS | : | Whuddup man, that's why I said buy 7 earlier. |
|---|---|---|
| U/M | : | Nah, dog I wasn't even calling your bum ass for that dog. |
| NICHOLS | : | Awww, what you calling for cuz I was sho finna say |
| U/M | : | Aye let me know if you run across a button for sale. |
| NICHOLS | : | A buttons for sale?" |
| U/M | : | Yeah |
| NICHOLS | : | Aight I gotchu. Imma call you. |
| *Multiple voices conversed in unintelligible conversation* | | |
| NICHOLS | : | I wish you woulda hit your bitch ass Jesse, I ain't gonna lie. Aight I |

44

gotchu, I'm finna call my nigga right now and call you right back`.

62.     Based upon their training, experience, and the investigation to date, case agents believe this conversation to refer to the UM asking to buy a machine gun conversion device (MCD) ("Button") from NICHOLS.  NICHOLS stated that he would reach out to an unknown third party.

63.     On August 21, 2024, at approximately 21:52hrs, NICHOLS, using **TARGET TELEPHONE 1**, received an incoming call from **TARGET TELEPHONE 5**, believed to be utilized by EUROPE JAMES. A summary of the conversation is set forth below.

| | |
|---|---|
| **NICHOLS**: | Switchy! |
| **JAMES**: | Where you at cuddy? |
| **NICHOLS**: | Switchy! |
| **JAMES**: | Where you at cuddy? |
| **NICHOLS**: | Right here on 36th and Townsend and headed to 61st and Burleigh |
| **JAMES**: | Hey come to me after that bro. |
| **NICHOLS**: | Aight, hey did you ever find them switch, them buttons? |
| **JAMES**: | Yeah I told him to let me know, when you ready |
| **NICHOLS**: | Alright I got another button for the 1-1 too. |
| **JAMES**: | Let me know when they're ready. |
| **NICHOLS**: | I think you got a career in this shit. |
| **JAMES**: | Man that's my name folks. |
| **NICHOLS**: | Man, Buddah want one.  He damn near want that like right now |
| **JAMES**: | Who want one? |
| **NICHOLS**: | What you gonna charge me for it? |
| **JAMES**: | Who want one? |

45

NICHOLS: Buddah, Nana baby daddy.

JAMES: Oh shit, he give me like 150

NICHOLS: Alright I'm finna call him right quick, I'll call you back.

JAMES: Aight

64.     Based upon their training, experience, and the investigation to date, case agents believe this conversation reflects JAMES and NICHOLS discussing MCD's, also known as a "switch" or "button". NICHOLS called JAMES by the nickname "Switchy" and stated that JAMES could make a career out of selling MCD's. The nature of the conversation and reference to "another button," and the statement, "I think you got a career in this shit," leads case agents to believe JAMES has conducted MCD transactions with NICHOLS and others in the past.

65.     On August 21, 2024, at approximately 21:52hrs, NICHOLS, using TARGET TELEPHONE 1, made an outgoing call to an Unknown Male, using (414) 406-9767. A summary is set forth below.

U/M: Yo

NICHOLS: Hey. Switchy said he got one for 150 for you.

U/M: 150?

NICHOLS: Yeah 150. I told him I was buyin it \

U/M: Aight say less

NICHOLS: When you gonna want it? Uou don't know yet?

U/M: Shit in probably the mornin

NICHOLS: Aight whenever Rog, I'll help you put that muthafucka on too

U/M: Aight I know how (UI)

NICHOLS: Long as you got you a g lock boy that boy gone go right on there

**U/M**:        Oh yeah I ain't worry that muthafucka goin on there anyway

66.    Based upon their training, experience, and the investigation to date, case agents believe this to refer to the earlier call sessions involving the UM requesting an MCD from NICHOLS.  NICHOLS stated that he would reach out to a third party and approximately 30 minutes later a call between JAMES and NICHOLS provided a MCD price which is re-stated in this call session.

67.    On August 27, 2024, at approximately 10:15hrs, NICHOLS, using **TARGET TELEPHONE 1**, made an outgoing call to **TARGET TELEPHONE 5**, believed to be utilized by JAMES.

**JAMES**:        Hello, hello?

**NICHOLS**:        What up E?

**JAMES**:        You sleeping over there nigga.

**NICHOLS**:        No (UI)

**JAMES**:        Huh?

**NICHOLS**:        No

**JAMES**:        Oh, I need a zap bro where you at?

**NICHOLS**:        You see where my location is

**JAMES**:        You staying there?

**NICHOLS**:        Pull up

**JAMES**:        Aight

68.    Based upon their training, experience, and the investigation to date, case agents believe this conversation reflects JAMES and NICHOLS discussing a suspected controlled

47

substance transaction.  JAMES ordered an ounce ("zap") of an unknown controlled substance.

69.     Based upon my training, experience, and investigation to date, I believe that JAMES' intercepted communications with NICHOLS reflect both controlled substance transactions and MCD transactions.

## **CHAUNCEY KING**

70.     Case agents, after they began monitoring the wire communications to and from WILLIAMS' via previous number of 747-955-6842, intercepted wire communication to and from Chauncey KING (414) 254-7701 (**TARGET TELEPHONE 6**).  Case agents were familiar with the historical listing of **TARGET TELEPHONE 6** to "King, Chauncey" at the address 4940 N 89th St, Milwaukee, WI 53225.   Additionally, **TARGET TELEPHONE 6** is associated with a CashApp account named "Chauncey King," with the handle $Cashh2723.  Law enforcement database checks list CHAUNCEY S. KING DOB: 05/27/1994 as previously listing the address, 4940 N 89th St, Milwaukee, WI 53225.

71.     A search of CCAP revealed KING is a convicted felon, with additional pending criminal charges, and his provided address is 4940 N. 89th Street, Milwaukee, WI 53225.

72.     On August 15, 2024, at approximately 10:35hrs, WILLIAMS' prior number of 747-955-6842 received an incoming call from **TARGET TELEPHONE 6**, believed to have been utilized by KING. Initially an unknown female could be heard in the background.

> **KING**:         What is... man... you around somebody
>
> **WILLIAMS**: I had, I told you I came back from South Carolina, I was tired bro
>
> **KING**:         I ain't know... look listen... all you gotta do is [UI], I know bro, did you be wanting shit [UI] money fosho bro and you do it too the point where a motherfucker gotta spend a bag, you get what I'm saying bro, [Overlap] sometimes nigga [UI] a little short shit just hear me out bro [UI]. I'm like going off your word bro.  That shit I gotta play on like half a pillow bro, that's why I kept calling and shit.

48

**WILLIAMS**: Bro I got [Overlap].............. I'm finna I'm finna get up bro, I'm finna come out, swear to god.

**KING**: Yeah can you come pull up on my bro.

**WILLIAMS**: Yeah, I got you bro.

**KING**: I got a play like half a pillow bro, that's why I been calling since yesterday shit bro. [UI].

**WILLIAMS**: [UI] Bro I'm coming.

**KING**: Alright, how long you thinking about an hour or something?

**WILLIAMS**: Yeah I'm finna get up now bro.

**KING**: Okay [UI], call me when you pulling up.

**WILLIAMS**: *response was unintelligible.*

**KING**: Don't spin me Dom bro. Im trying to get this shit back going bro, because the price you got them at, I know how it's gonna go and shit gone go right bro. You know I spend my money with you bro, shit just be tight sometimes. Bust a couple plays to get some shit going bro.

**WILLIAMS**: Alright, here I come brudder.

**KING**: Alright.

73.     Based upon their training, experience, and the investigation to date, case agents believe this conversation reflects KING checking in on the previously discussed narcotics transaction. KING refers to WILLIAMS by the name "Dom" which case agents believed to refer to a shortened version of DOMINIQUE WILLIAMS.

74.     On August 15, 2024, at approximately 12:24hrs, WILLIAMS, using his former number of 747-955-6842, made an outgoing call to **TARGET TELEPHONE 6**, believed to have been utilized by KING.

**KING**: Hello?
**WILLIAMS**: *response was unintelligible.*

49

KING:        Hello?

WILLIAMS: Yo.

KING:         What it do?

WILLIAMS: On my way.

KING:        Alright. I'm waiting on you.

WILLIAMS: Alright

KING: *response was unintelligible.*

75.    Based upon their training, experience, and the investigation to date, case agents believe this conversation reflects KING checking in on the previously discussed narcotics transaction.

76.    On August 15, 2024, at approximately 12:26hrs, WILLIAMS, using his former number of 747-955-6842, received an incoming call from **TARGET TELEPHONE 6**, believed to have been utilized by KING. A summary of the conversation is set forth below.

WILLIAMS: What up

KING:        What up. Look, this is what i was trying to tell you, bro. You know I got, uh, I got a play down, bro. I got a play on the Four. You get what I'm saying? So I was just gonna buy the eighth, bro. But I'm not trying to, you get what I'm saying?

WILLIAMS: Yeah

KING:        I'm not trying to pull up weighing this shit, bro.

WILLIAMS: So what you trying to do? You trying to give me half?

KING:        Bro.

WILLIAMS: (UI). What you want?

KING:        Yeah, cause what she wants for half? What you want for half of it?

50

**WILLIAMS**: *response was unintelligible.*

**KING**: You already know, just, just, just bring.. look, just bring, uh, just bring, uh, just bring like three. Just bring like three. And then ima do that real quick and then (UI)

**WILLIAMS**: *response was unintelligible.*

**KING**: That's what I was trying to, that's what I was trying to tell you, (UI) like that bro. I had a play on like two, three halves. That's why I kept calling.

**WILLIAMS**: [UI] I'm finna come there, I'm finna pull up.

**KING**: I had to, look, I had to, when I was stopped by that zip, was (UI) to get it and give it to dude, bro (UI) to see what was up with it. That's why I kept, that's why I kept calling.

**WILLIAMS**: Alright (UI).

**KING**: I had the money in my face. (UI).

**WILLIAMS**: Alright

**KING**: I know you trying to set up on the phone on that, just bring me, bring, um, bring like three for me. Bring like three. Then I'll come back and I'll buy the rest of them fo sho.

**WILLIAMS**: Alright.

**KING**: That straight?

**WILLIAMS**: Alright.

**KING**: Alright

77.    Based upon their training, experience, and the investigation to date, case agents believe this conversation reflects KING discussing the previously discussed narcotics transaction and requesting a larger quantity of suspected methamphetamine.

78.    On August 16, 2024, at approximately 01:22hrs, West Allis Police Department arrested KING following a traffic stop in which KING was the driver of a vehicle that initiated a

high-speed pursuit after ramming two law enforcement vehicles. After KING was arrested, officers searched his person and the driver's seat area of his vehicle, recovering approximately 79.05g of methamphetamine, 12.85g of fentanyl, 48 Oxycodone pills, 37 Hydromorphone pills contained in various baggies, 2 fentanyl transdermal patches, and 22 Suboxone patches.

79. A search of the entire vehicle yielded the recovery of a black digital scale; a black flip phone in the front passenger door map pocket; and multiple flip phones and a smart phone in the center console cupholder area. The phones were covered in trace amounts of suspected methamphetamine powder. The combination of the digital scale, several cellular phones, and the amount of narcotics, along with the manner in which the narcotics were packaged, is consistent with that of street-level drug distribution.

80. Based upon my training, experience, and investigation to date, I believe that KING's intercepted communications with WILLIAMS concerned suspected controlled substances, namely methamphetamines. These intercepted communications lead up to the day before KING was arrested in possession of a large amount of methamphetamine, among other narcotics. Case agents believe WILLIAMS to be KING's source of supply for the methamphetamines recovered on August 16, 2024.

## ANDRE MCKEE

81. On July 20, 2024, at approximately 17:53, NICHOLS, using **TARGET TELEPHONE 1**, made an outgoing call to Andre MCKEE, using (414) 737-2265 (**TARGET TELEPHONE 7**). A summary of the conversation is set forth below.

> **MCKEE**: Hello?
>
> **NICHOLS**: Hey, what it do?
>
> **MCKEE**: Whats the word?

52

**NICHOLS**: Where you at?

**MCKEE**: The crib.

**NICHOLS**: What you got going?

**MCKEE**: Shit.

**NICHOLS**: Oh, Uh... You ain't find no one with some smoke?

**MCKEE**: Hell no, bro.  I'm pissed, bro.  Even the backup nigga's that I was telling you about yesterday, the Jack Frost nigga. He talking about he trying to find some more.  I know what that shit means, that shit over with.  \

**NICHOLS**: You said what?

**MCKEE**: The nigga can't even get no more of it... Like we dead in the water, I aint gonna lie to you. We dead in the water.

**NICHOLS**: Thats alright, Pluffins will be here tonight.

**MCKEE**: Tonight?

**NICHOLS**: Yeah, they always come around at night-time, like on the weekends, at the night.  They always come around that time.

**MCKEE**: Damn.

**NICHOLS**: Think about it, it's been two weeks... It's the weekend...

**MCKEE**: You know this for sure or you just hypothetical?

**NICHOLS**: Hypothetical, but still... I was already told this personally from Pluffins, Big Pluffins himself.  Already told, I gotta take care of it.

**MCKEE**: You said what?

**NICHOLS**: That I gotta take care of it.

**MCKEE**: Really, what you mean?

**NICHOLS**: Like, I gotta go get it off the truck and shit..... [UI]  Hello?

**MCKEE**: Yeah, when you gotta do it.... So, what going on?

**NICHOLS**:   He gonna call me, when he gonna pick it up.  And he called and

53

telling me that today, so I'm hoping it's tonight.

MCKEE:        Okay.

NICHOLS:        But then, you gonna get to calling G and them, and all them people, Bro. I aint got time for you to be doing that.

MCKEE:        You already know how that shits gonna go.

NICHOLS:        No, Bro... Don't call nobody, dude.

MCKEE:        You should damn near have conversation with Big Pluffins now and go ahead and tell him, listen. Cause let me... Let me... Gone ahead put me whoopty, whopty, Bam, to the side whoopty woo, you know what I'm saying?

NICHOLS:        No, You not listening to me.... You! Don't go back and tell them. Don't go back and ask or say nothing!

MCKEE:        About what?

NICHOLS:        Hell naw, bro... You acting slow, I don't wanna talk to you.

MCKEE:        Nigga, what you mean? Our conversations stay between us!

NICHOLS:        You acting like a slow ass person.... Don't call G and say nothing?

MCKEE:        Why would I call G?

NICHOLS:        Huh?

MCKEE:        Why would I call G and say something... I don't give a fuck about none of that. "Hey, is it true, that the plugs in town"...Hell no, I'm passed that, I was doing that when we first started, when I first started. I ain't doing none that shit no more, I'm waiting on a phone call. I just wait for a motherfucker to call me. All that calling motherfuckers, "Is it in yet", "Is it in yet"... You get what I'm saying? I ain't finna keep irritating a grown ass man. When it's in, he gonna call me and tell me its in, or he's gonna send a text message out like he do every time. You know what I'm saying. I ain't finna bust nobody's chops. I don't know what bro got going. .

NICHOLS:        I just don't need you to do that.

MCKEE:        I'm waiting on you then... Whoever call me first.

54

> **NICHOLS**: Yeah, So when I get that call tonight, I'm gonna just call you and you can have them.
>
> **MCKEE**: Alright, I got you.

82. Investigators believe this call reflects MCKEE and NICHOLS discussing a marijuana ("smoke") drought in the area. MCKEE could not find any available marijuana, stating, "The nigga can't even get no more of it... Like we dead in the water, I ain't gonna lie to you." NICHOLS replied, "That's alright, Pluffins will be here tonight," which investigators understood to mean that the marijuana re-up would be occurring that evening or in the near future. NICHOLS explained to MCKEE that he was told that hypothetically "they" would come in on the weekend by "Big Pluffins himself," stating that he had to take care of it. NICHOLS stated that he would have to "get it off the truck and shit" which investigators believe to refer to NICHOLS physically unloading the marijuana re-up off of a truck. NICHOLS then told MCKEE to not call Jerald Campbell ("G") and the others because of the drama that would occur.

83. On July 21, 2024, at approximately 16:21pm, NICHOLS, using **TARGET TELEPHONE 1**, received an incoming call from MCKEE using **TARGET TELEPHONE 7**. A summary of the conversation is set forth below.

> **NICHOLS**: Hello
>
> **MCKEE**: Bro if you need smoke you need to come to me right now bro. My nigga over here right now with the smoke he got two yings right now. I ain't gonna lie this shit gonna be gone by the end of the day.
>
> **NICHOLS**: Its dope?
>
> **MCKEE**: Nigga I'm putting on the menu you know its dope. It's the same nigga, it's the same people we been fucking with. Not Cass, not the little nigga that we met at Pax. Its the other people. This shit dope as a motherfucker nigga. But you have to pull up over here now nigga. I got BC the kid pulling up over here, all the cousin people damn near about to pull up trying to grab this shit right now. That's why I'm trying to call you. I'm blowing your phone up like a bitch.

I'm like c'mon nigga c'mon. Got two yings, two different flavors.

NICHOLS: I'm finna pull up and check it out.

MCKEE: Aight

NICHOLS: I ain't paying over two g's though.

MCKEE: You said what?

NICHOLS: I ain't paying over two g's.

MCKEE: You said what?

NICHOLS: I ain't paying over two g's.

MCKEE: That's what he want, he want 2, bro. Let me know you in the back.

NICHOLS: Huh?

MCKEE: Let me know you in the back.

NICHOLS: I'm finna pull up.

MCKEE: Nigga I'm out here this shit look beautiful as fuck. Look answer your Facetime.

84. Investigators believe this conversation reflects MCKEE offering pounds of marijuana ("smoke") to NICHOLS. MCKEE requested that NICHOLS facetime him to observe the product.

85. On July 22, 2024, at approximately 11:05am, NICHOLS, using **TARGET TELEPHONE 1**, received an incoming call from Andre MCKEE, using **TARGET TELEPHONE 7**. A summary of that conversation is set forth below.

NICHOLS: Hello.

MCKEE: What's the word?

NICHOLS: What it do?

MCKEE: Shit, I should use the Jeep?

NICHOLS: I'm taking my rental back today, so I will be in the Jeep.

| MCKEE | : | You said what? |
|---|---|---|
| NICHOLS | : | I'm taking my rental back today so I'm gonna be in the Jeep. |
| MCKEE | : | Oh man, what time's the rental? |
| NICHOLS | : | (UI). |
| MCKEE | : | (UI) you need a ride? (UI). |
| NICHOLS | : | (UI) mother fucker. |
| MCKEE | : | Alright shit man, let me know if you need anything. |
| NICHOLS | : | I need a couple dollas. |
| MCKEE | : | I'm already done. |
| NICHOLS | : | I ain't got no weed. |
| MCKEE | : | I got somebody else that got some more new fire shit...(silence)..they got like (UI) get a ying for like 1850...Uncle Snoop like (UI) the, the strain Uncle Snoop (UI) for ya. That's what I got in my patch right now. This shit, lovely nigga, no problems. He gave me a hive yesterday for 900. |
| NICHOLS | : | What you say? |
| MCKEE | : | I said he gave me a hive yesterday for 900. This was my, one of my other people. So...nigga...big buds everything. So he'll definitely do... |
| NICHOLS | : | Yeah (UI). |
| MCKEE | : | Yeah definitely do a hard one for 18. |
| NICHOLS | : | (UI). Alright, shit. I'm gonna get that paper together. I'll call you. |
| MCKEE | : | Alright. |

86.     Investigators believe this conversation to refer to MCKEE offering various marijuana strains in various amounts and prices. The prices quoted are consistent with pound and half pound

57

amounts of marijuana. NICHOLS stated that he would get the money ("paper") for the purchase.

87.     On July 22, 2024, at approximately 11:05am, NICHOLS, using **TARGET TELEPHONE 1**, made an outgoing call to MCKEE, using **TARGET TELEPHONE 7**. A summary of the conversation is set forth below.

> **MCKEE**:     Hello?
>
> **NICHOLS**:   Ay, where you at?
>
> **MCKEE**:     Funna pull up at the house
>
> **NICHOLS**:   Call and get one of them for me
>
> **MCKEE**:     Aight
>
> **NICHOLS**:   The topest
>
> **MCKEE**:     Aight, I got you
>
> **NICHOLS**:   You said 18 right? Or you need more?
>
> **MCKEE**:      I dont know, I don't know for sure, I gotta see
>
> **NICHOLS**:    Man...

88.     Investigators believe this conversation reflects price per pound of marijuana that NICHOLS had ordered from MCKEE in a previously intercepted session.

89.     On July 27, 2024, at approximately 14:23pm, NICHOLS, using **TARGET TELEPHONE 1**, received an incoming call from an Unknown Male (UM) using (414) 309-3130. A summary of the conversation is set forth below.

> **NICHOLS**:   Hello?
>
> **U/M**:        What up cuz, dog ready he trying to see where you're trying to meet at?
>
> **NICHOLS**:   [UI]

58

| | |
|---|---|
| **U/M**: | You said where? |
| **NICHOLS:** | Y'all gotta pull up, I can't meet ya'll nowhere |
| **U/M**: | Where I gotta come cuz, i'll come and make everything happen |
| **NICHOLS**: | Come to 40th and Ruby, How long? |
| **U/M**: | Shit he coming from Racine bro, you gotta give him at least 20-30 minutes to get here |
| **NICHOLS**: | aight, you said this nigga name was what? |
| **U/M**: | JJ, I know him cuz, he good bro. Imma do everything, you ain't gotta do nothing he ain't even gotta see your face |
| **NICHOLS**: | So you said he wanted the 4 right? |
| **U/M**: | Yea the 4 and a half |
| **NICHOLS**: | Alright, how long is that gonna take about an hour? 30 minutes? |
| **U/M**: | 30-40 minutes cuz. So 40th and Ruby? You got like an address nearby bro, give me an address nearby |
| **NICHOLS**: | 4466 N 40th |
| **U/M**: | 4466 N 40th, Bet. |

90. Investigators believe this conversation to refer to the UM ordering up 4.5 ounces of suspected cocaine for a third-party customer located in Racine, Wisconsin. NICHOLS provides 4466 N 40th Street Milwaukee, WI, or **TARGET LOCATION 7**, which investigators know to be a residence associated with MCKEE, to the UM as the drug transaction location.

91. On August 14, 2024, at approximately 15:15pm, NICHOLS, using **TARGET TELEPHONE 1,** received an incoming call from Andre MCKEE, using **TARGET TELEPHONE 7**. A summary of the conversation is set forth below.

| | |
|---|---|
| **NICHOLS**: | Hello? |
| **MCKEE**: | What it do? (Possibly talking to someone else: Hey tell him I'm |

59

pulling up to the car.)

NICHOLS: Huh?

MCKEE: Hello. What's the word.

NICHOLS: What up?

MCKEE: I was just, I was just half asleep. What's the word. You on the way to the meeting?

NICHOLS: Yeah I was. What you got for me?

MCKEE: 20 20 for uh 20 25.

NICHOLS: Some new world order shit.

MCKEE: You gonna keep it going like that. I been, I now, I been having like a little bit of problem with the lows but I mean I aint gonna lie i been getting them off. (UI) be having kinda like (UI).

NICHOLS: You gotta just keep mixing them bro. Fuck them niggas bro.

MCKEE: Yeah. I just gotta keep mixing that shit up.

NICHOLS: I mix it so cold though cause we gotta, we gotta top lightskin. Green *(overlapping conversation)*.

MCKEE: So what you mix... Hold on hold on. So what you mixing, cause you mixing the, you mixing it before hand.

NICHOLS: I'm not mixing it. So what I been doing is. It. OK say they want a zap. I give em a zap with all the flav, same flav, like different flavors. Like so say they buy a zap from you. It catches 7 (UI)...

MCKEE: Oh yeah (UI). Yeah you definitely get it, yeah you definitely get a 7 of the lows.

NICHOLS: No I', saying I do not. I'm in the front. No I'm finna pull up in the back.

MCKEE: Yeah come to the back.

NICHOLS: I be...hey I finna get this house right across the street from yall. 4467.

60

|         |                                                                                  |
|---------|----------------------------------------------------------------------------------|
| MCKEE:  | Get it.                                                                           |
| NICHOLS:| I'm definitely finna get it, but it's ah rented out. I was thinking shit.         |
| MCKEE:  | Man you better grab that mother fucker.                                           |
| NICHOLS:| Ya'll cool with yall house on what.                                               |
| MCKEE:  | What the fuck?                                                                    |
| NICHOLS:| What?                                                                             |
| MCKEE:  | That little nap was well needed, I had that lil nigga running the phones and shit.|

92.    Investigators believe that when NICHOLS references getting a house directly across from MCKEE's and stated "4467," he is refencing the house directly across the street from MCKEE's residence at **TARGET LOCATION 7**.

## ANTHONY HANES

93.    On July 2nd, 2024, at approximately 16:42pm, NICHOLS, using **TARGET TELEPHONE 1**, received an incoming call from an Anthony HANES, also known as "Squirrel," using his former number of (608) 239-8215. An approximate summary of that conversation is set forth below.

|         |                                                  |
|---------|--------------------------------------------------|
| NICHOLS:| What up, what do you possibly want g?            |
| HANES:  | Aye?                                             |
| NICHOLS:| What up?                                          |
| HANES:  | Hello? You want me to bring one of these out?    |
| NICHOLS:| What?                                             |
| HANES:  | Hello?                                            |
| NICHOLS:| What?                                             |

61

> **HANES**: We have a ton of bags man.
>
> **NICHOLS**: I can't hear you, what you say?
>
> **HANES**: I was trying to buy a woo, man.
>
> **NICHOLS**: I know, you at work right now, here I come, damn.

94.  Case agents believe this conversation reflects HANES and NICHOLS having cocaine ("woo") located in the residence located at 4414 N 39th Street.

95.  On July 10th, 2024, at approximately 12:39pm, NICHOLS, using **TARGET TELEPHONE 1**, received an incoming call from HANES, again using his former number of (608) 239-8215. A summary of the conversation is set forth below.

> **NICHOLS**: Hello.
>
> **HANES**: Aye why you leave for let me go grab my money. I'm tryna go get my woo dog let me go bust my move.
>
> **NICHOLS**: What you mean?
>
> **HANES**: Huh? I'm tryin to grab some paper real quick dog, you just took off, I was asking you a question, you just took off.
>
> **NICHOLS**: So, so what the fuck nigga, go grab the paper.
>
> **HANES**: Huh, I did what, what you say? Hello? What you say? Hello?

96.  Investigators believe this conversation to refer to HANES asking to purchase an unknown amount of cocaine ("woo") from NICHOLS for his own distribution ("let me go bust my move"). NICHOLS tells HANES to get the money for the deal ("Go grab the paper").

97.  On August 29th, 2024, at approximately, 13:32pm, NICHOLS, using **TARGET TELEPHONE 1**, receiving an incoming call from HANES, using another number associated with him (414-213-3454). A summary of the conversation is set forth below.

> **HANES**: Man I told you what it was man why would you leave? Where you at on Medford? Hello?

| NICHOLS: | Im about to pull back up. |
|---|---|
| HANES: | Man can I just come get it dog, I gots people to take care of. I got a car, I got gas, I just come get it and go. |
| NICHOLS: | Did you get the shit for the house? |
| HANES: | I got all that man, (UI) 600 dollars. But it's all good I got my twenty. But whats up, how long im in the car. You could have just put the shit on the table I told you I had the money. (UI), where you at dog? |
| NICHOLS: | About to pull up. |
| HANES: | (UI) thats crazy, whatever (UI).... |
| NICHOLS: | Im just pulling up. |

98.     Investigators believe this conversation reflects HANES inquiring on where NICHOLS is located, due to HANES wanting to pick up narcotics to serve to his clients.

99.     On July 25th, 2024, at approximately, 19:10pm, NICHOLS, using **TARGET TELEPHONE 1**, received an incoming call from HANES, using (262) 388-1394 (**TARGET TELEPHONE 8**). A summary of the conversation is set forth below.

| HANES: | Dog. |
|---|---|
| NICHOLS: | Hello? |
| HANES: | Hey, text me Domo number real quick. |
| NICHOLS: | Alright, you like to have real people names in front of uh [OV] |
| HANES: | Man, [UI] can you hurry? |

100.     Investigators believe this call reflects HANES asking NICHOLS for Dominique WILLIAMS a.k.a "Domo's" phone number via text.

101.     At approximately 18:32pm, NICHOLS, using **TARGET TELEPHONE 1**, received an incoming call from HANES, using **TARGET TELEPHONE 8**. An approximate summary of

the conversation is below.

| | | |
|---|---|---|
| **NICHOLS**: | Hello? |
| **HANES**: | Hello. |
| **NICHOLS**: | What up? |
| **HANES**: | Yeah, where you at? |
| **NICHOLS**: | 18th. |
| **HANES**: | Aight, I got a couple dollas bout to go get some gas. |
| **NICHOLS**: | [OV] |
| **HANES**: | I'm right here. |
| **NICHOLS**: | [OV] can you bring me my money counter? |
| **HANES**: | I ain't at the house. I go get it, whatever. Man. , |
| **NICHOLS**: | Thank you. |
| **HANES**: | Go get me some gas, goin' all the way back over there. Bye. |
| **NICHOLS**: | Shut yo bitch ass up, nig- |
| **HANES**: | I'm on my way. Do you want me to go get it or not? |
| **NICHOLS**: | Yes. |
| **HANES**: | Then what else? |
| **NICHOLS**: | The money counter. |
| **HANES**: | Okay. Honey callin' okay bye. |
| **NICHOLS**: | [UI] |
| **HANES**: | Damn. |

102. Investigators believe this conversation reflects NICHOLS asking HANES to bring NICHOLS' electronic money counter over to 1810 W Atkinson, Milwaukee, WI. HANES

conducted numerous deals throughout the day at 1810 W Atkinson, Milwaukee, WI, and investigators believe NICHOLS likely had a large amount of US currency on his person based on static surveillance of drug transactions and the high volume of pertinent calls placed that day.

103.    On August 25th, 2024, at approximately 19:29pm, NICHOLS, using **TARGET TELEPHONE 1**, received an incoming call from HANES, using **TARGET TELEPHONE 8**. A summary of the conversation is set forth below.

| | |
|---|---|
| **NICHOLS**: | Hello |
| **HANES**: | Yeah, right here man, where you at? |
| **NICHOLS**: | I'm at the gas station, getting gas. |
| **HANES**: | Give it to me already. I'm finna go-pull up, can you have it ready? I don't wanna stand out [UI]. A dub. I'll be over there. I gotta turn and I don't know how long it's going to take you. |
| **NICHOLS**: | Aight c'mon, bro, I'm right here bro. |
| **HANES**: | Bro I'm right here too, nigga why you take so long, I'm standing there. |
| **NICHOLS**: | What? |
| **HANES**: | Get a dub out bro, whatever it is. I gotta serve these people. Where you at? |
| **NICHOLS**: | I'm looking at you bro |
| **HANES**: | [UI] how long I gotta stand here. |
| **NICHOLS**: | [UI] 416-8334. |
| **HANES**: | [UI] muhfuckin' gas station, man. |
| **NICHOLS**: | I'm right here man! |

104.    Investigators believe this conversation reflects HANES requesting a $20 of suspected controlled substance from NICHOLS to "serve these people."

## DEVIN EILAND

105.    On July 6th, 2024, at approximately 21:36pm, NICHOLS, using **TARGET TELEPHONE 1**, made an outgoing call to Devin Eiland (EILAND) using (414) 499-6083 (**TARGET TELEPHONE 9**). During that call, they converse about drug customers, amounts, and monetary compensation owed to NICHOLS. An approximate excerpt from the conversation is set forth below.

> **NICHOLS**:    [UI] If I got any heads, Imma send you to 'em.
>
> **EILAND**:    Yeah, that cool 'cause it's yeah. I gotchu. Alright.
>
> **NICHOLS**:    Alright five three five yo tax.

106.    I believe this conversation reflects NICHOLS stating he will send any drug customers ("heads") to EILAND while NICHOLS heads to SummerFest.  Based on the amount quoted and the context of the conversation, case agents believe the reference to a "tax" of "five three five" indicates EILAND had previously been fronted a controlled substance by NICHOLS, for which he will repay NICHOLS $535.

107.    On July 12th, 2024, at approximately 14:15pm, NICHOLS, using **TARGET TELEPHONE 1**, made an outgoing call to Devin Eiland (EILAND), using **TARGET TELEPHONE 9**.  The conversation references "Xavier" and "Kilos". An approximate excerpt follows:

> **EILAND**:    What it do.
>
> **NICHOLS**:    What it do.
>
> **EILAND**:    Whats the word.
>
> **NICHOLS**:    Where you at.

66

**EILAND**:       About to pull up by the crib.

**NICHOLS**:    I got to move quick.

**EILAND**:       Right.

**NICHOLS**:    Remember Xavier?

**EILAND**:       Yes.

**NICHOLS**:    He just Face Timed me with three or four Keys. He just got sent to Telegram.

**EILAND**:       Ohh, need that! T

**NICHOLS**:    Shit, bust him.  Just bust him, nigga... Sell the P's, sell the P's

**EILAND**:       Lets bounce.

**NICHOLS**:    Young as a bitch, little as a bitch. Young nigga, bet

**NICHOLS**:    He got a scam now he isn't a hoe

**EILAND**:       For sure. I am going to call you in like 20 minutes.

**NICHOLS**:    You ain't on shit if you don't do that now, little dog trying to move them hoe's. Little dog like another like me bro, he not gonna have them that long.

**EILAND**:       [UI]

**NICHOLS**:    [UI]. He is not going to have them that long.

**EILAND**:       Where he at cuz.

**NICHOLS**:    He is on 37th and uhh... Right down the street from you, nigga. Right around the corner.

**EILAND**:       Alright I am finna call.

**NICHOLS**:    What you mean you finna call

**EILAND**:       I am going to call "Doda"

**NICHOLS**:    Doda, What are you calling him for?

67

| | | |
|---|---|---|
| **EILAND**: | Yeah, He [UI] That's just my nigga, Either you or him. |
| **NICHOLS**: | You say what? |
| **EILAND**: | We just need a ride real fast |
| **NICHOLS**: | Take a ride real fast? |
| **EILAND**: | Uh,huh |
| **NICHOLS**: | I am going to call him and play it off like where you at bro. I am coming back. How much you want for them? Where you at? I'll call you back. |
| **EILAND**: | Alright |

108.     Investigators believe this conversation refers to "Xavier" as having utilized Facetime to contact NICHOLS, who observed "three or four" kilograms ("keys") of cocaine through the encrypted messaging platform, "Telegram." NICHOLS suggests that EILAND rob ("bust") the unknown male "Xavier" for his product. EILAND stated that he needed a vehicle first. Nothing further regarding this possible heist was noted throughout the following calls.

109.     On July 21, 2024, at approximately 21:29pm, NICHOLS, using **TARGET TELEPHONE 1**, made an outgoing call to Devin EILAND using **TARGET TELEPHONE 9**. An approximate summary of the conversation is set forth below.

| | | |
|---|---|---|
| **EILAND**: | Hello? |
| **NICHOLS**: | What it do? You called? |
| **EILAND**: | Yeah, cuz. Where you at? |
| **NICHOLS**: | Mill Rd., and Sydney. |
| **EILAND**: | I don't even know where the fuck that is. (Inaudible) grab them zips. |
| **NICHOLS**: | Alright. Where ya'll at? |
| **EILAND**: | [UI]. |

68

110.     Investigators believe this conversation to refer to EILAND ordering up ounces ("zips") of an unknown controlled substance from NICHOLS.  NICHOLS agreed and asked what location EILAND was located at.

111.     At approximately 21:41pm, NICHOLS, using **TARGET TELEPHONE 1**, made an outgoing call to EILAND using **TARGET TELEPHONE 9**.  A summary of the conversation is set forth below.

> **NICHOLS**:     Where you at bro?
>
> **EILAND**:      I'm right here on 36th at the gas station, grabbing blunts for bro.
>
> **NICHOLS**:     You buy your actions some blunts?
>
> **EILAND**:      He needed some woods. He finna pay me.
>
> **NICHOLS**:     He apply that to the two zips?
>
> **EILAND**:      Yeah, he wants the two zips.
>
> **NICHOLS**:     I'm going to Chipotle. You at the BP.
>
> **EILAND**:      Yup, right here on 36th, coming up on 38th.
>
> **NICHOLS**:     Turn off, I'm right here. He bought the whole two zaps.
>
> **EILAND**:      Yup, he bought the two zaps. I see you right there.
>
> **NICHOLS**:     Wasn't me. I got some long islands in me.
>
> **EILAND**:      Where did you go?
>
> **NICHOLS**:     I went to the fair. Come open the back door.

112.     Investigators believe this conversation to refer to the controlled substance ordered up in a previous session by EILAND.  NICHOLS asked if EILAND bought his customer, ("action") some rolled tobacco ("blunts").  EILAND stated that the customer wanted two ounces ("two zips"). The two interceptees then communicate at the meet up location.

113.    On July 28th, 2024, at approximately, 13:42pm, NICHOLS, using **TARGET TELEPHONE 1**, received an incoming call from Devin EILAND, using **TARGET TELEPHONE 9**. An approximate excerpt of the conversation is set forth below.

NICHOLS:    Hello

EILAND:    What you doing, pimpin?

NICHOLS:    Heading to the trap.

EILAND:    18th or your crib?

NICHOLS:    18th.

EILAND:    I need a Cutie so I can catch a couple plays, bro.

NICHOLS:    No money on it?

EILAND:    I've been with you, knocking yards down

NICHOLS:    What yards you knock down, you ain't knocked down any yards.

EILAND:    Cuz, them yards knocked down last time [UI] with Domo, I would have been paid you for a Cutie.  I just didn't get paid.

NICHOLS:    Cuz, what work did I see you do?  It's been your birthday the last couple days, I ain't seen you do shit.

EILAND:    I'm talking [UI] I did all that work for no pay, that's why I had no birthday on my birthday.

NICHOLS:    I paid you on Hampton for 41st.

EILAND:    You only gave me 80, cuz... You told me you was gonna give me the rest later.

NICHOLS:    Ain't nobody had a set price on what I was giving them that day.  I paid you for the hours you were there.  You weren't even there for 8 hours.

EILAND:    [UI]

NICHOLS:    When I get to 18th, I'm gonna have you pull up.  I'm gonna put something together, bro.  Listen bro, dude owe me...

70

| EILAND | : | Alright. |
|---|---|---|
| NICHOLS | : | I ain't trying to come up short, I ain't trying to be missing none of my money either, bro. I always gotta cover your ass. |

114.    Investigators believe this conversation reflects NICHOLS providing marijuana to EILAND for him to sell to his customers.  EILAND will, in turn, pay NICHOLS some of the profits.

## <u>CHARLES BROWN</u>

115.    On July 3, 2024, at approximately 19:59, NICHOLS, using **TARGET TELEPHONE 1**, made an outgoing call to Charles BROWN, using his former number of (262) 693-0877. During that call, law enforcement believes they converse about controlled substances and associated prices.  An approximate excerpt from the conversation is set forth below.

| BROWN | : | You owe me a 3.5 man. |
|---|---|---|
| NICHOLS | : | You don't have to extort me like that. |
| BROWN | : | You owe me a 3.5 man, I told you I gone put the word for you man. |
| NICHOLS | : | How I owe you a 3.5 (UI)? |
| BROWN | : | I said nephew its only right if he go to you man, like that don't even make sense, especially he catching your plays man. |
| NICHOLS | : | What? |
| BROWN | : | Huh? |
| NICHOLS | : | Hey you at the crib? |
| BROWN | : | Who me? |
| NICHOLS | : | You over here on the 6th? |
| BROWN | : | Yea I'm upstairs. |
| NICHOLS | : | Alright I'm outside |

116.     On August 4, 2024, at approximately 19:07, WILLIAMS, using his prior number of (747) 955-6842, made an outgoing call to BROWN, using (470) 208-8160, **TARGET TELEPHONE 10.** During this conversation, law enforcement believes they discuss a suspected methamphetamine ("ice") transaction. An approximate expert follows below.

> **WILLIAMS**: What you sleep nigga?
>
> **BROWN**:     What's up?
>
> **WILLIAMS**: You sleep cuz?
>
> **BROWN**:     [UI]. Yup.
>
> **WILLIAMS**: I need umm, I need some I need some ice.
>
> **BROWN**:     How much?
>
> **WILLIAMS**: [UI].
>
> **BROWN**:     Huh?
>
> **WILLIAMS**: [UI].
>
> **BROWN**:     You want a separate or the same thing?
>
> **WILLIAMS**: Same thing.
>
> **BROWN**:     Aight, where you at?
>
> **WILLIAMS**: Across the street.

117.     On August 8, 2024, at approximately 21:33, NICHOLS, using **TARGET TELEPHONE 1**, made an outgoing call to Charles BROWN, using **TARGET TELEPHONE 10**. During this conversation, law enforcement believes they discuss suspected cocaine ("new shit") and the method by which they could transition that cocaine from its powder to its "hard" or "crack" form ("you gotta know how to shake it"). An approximate expert follows below.

> **BROWN**:     Yo.

| **NICHOLS** | : | That new shit from [UI] nigga [UI] |
|---|---|---|
| **BROWN** | : | Huh? |
| **NICHOLS** | : | That new shit from them not bad. |
| **BROWN** | : | Yeah huh. Pull up. |
| **NICHOLS** | : | You hear me? |
| **BROWN** | : | Yeah pull up. |
| **NICHOLS** | : | Yeah cause I did some shit bro and everybody calling me [UI]. |
| **BROWN** | : | You gotta know how-you gotta know how-you gotta know how to shake it, baby. |
| **NICHOLS** | : | Shake it baby? [UI] losin' weight. |
| **BROWN** | : | Just come over. Imma show you how to shake it the right way. |
| **NICHOLS** | : | You gon-I got these mothafuckas hard as a brick, bro. You gotta do somethin' bro. I ain't gon lie, bro. Man, I ain't even use-I use that one shit that was in that tub cause I thought you still had some left. And the dude [PH] wadn't open, but I needed to get some shit done. |
| **BROWN** | : | Just come over-just come over let me see. Bring it over once. |

118.     On September 3, 2024, at approximately 10:00am, BROWN exited the residence of 2857 N 26th Street, Milwaukee, Wisconsin (**TARGET LOCATION 3**) wearing a white t-shirt and gray jogging pants.   BROWN met with the passenger side of a Black Porche and returned inside the residence.  At approximately 11:40am, BROWN exited the residence and stood on the porch until a blue Mazda CX-50 bearing a possible Idaho registration [1JT894] with no associated vehicle listing, arrived and parked on the west side of the street in front of 2857 N 26th Street.  BROWN walked to the front passenger window and interacted with the occupant(s).  BROWN walked back into the residence carrying an approximate quarter pound of suspected marijuana in a clear bag.

73



## VII.   <u>OTHER ISSUES</u>

119.   I know, based upon my training and experience, that controlled substances and evidence of narcotics trafficking can be secreted in any part of a residence including garages, storage areas related to the premises, vehicles on and associated with the premises, barns, and on persons engaged in drug trafficking within the residence; that through personal training and experience in investigating drug trafficking, affiant knows controlled substances are frequently stored with drug proceeds and other drug paraphernalia at drug traffickers residences; that the execution of a search warrant usually results in the seizure of such items of personal property as utility bills, canceled mail envelopes, bank statements, keys, photographs, videotapes, and other items or documents which establish the identities of persons residing in or having control of the premise; and that these items can be stored in various locations accessible to the target residence including vehicles and garages. Therefore, I believe it is reasonable to believe that an individual engaged in drug trafficking would conceal evidence related to drug trafficking in multiple areas associated with their residence

74

including vehicles, garages, barns, and basements, and include such locations in the definition of the

**TARGET PREMISES.**

120.     As described above and in Attachment B, this application seeks permission to search

for records that might be found on the **TARGET PREMISES**, in whatever form they are found.

One form in which the records might be found is data stored on a computer's hard drive, cellular

telephone, or other storage media.   Thus, the warrant applied for would authorize the seizure of

electronic storage media or, potentially, the copying of electronically stored information, all under

Rule 41(e)(2)(B).

121.     *Probable cause.*   I submit that if a computer, cellular telephone, or storage medium

is found on the **TARGET PREMISES**, there is probable cause to believe those records will be

stored on that computer or storage medium, for at least the following reasons:

  a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

  b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

  c.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

75

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

122. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **TARGET PREMISES** because:

e. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

f. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically

76

contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

g.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

h.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

i.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the

77

presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

j.    I know that when an individual uses a computer to operate a website that is used for illegal conduct, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

123.  *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

k.    The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.
.

78

l.      Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

m.     Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

124. *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

125. The warrant I am applying for would permit law enforcement to obtain from the display of physical biometric characteristics (such as fingerprint, thumbprint, facial, or iris characteristics) to unlock devices subject to search and seizure pursuant to this warrant.  I seek this authority based on the following:

126. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices, and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer

a combination of these biometric features, and the user of such devices can select which features they would like to use.

127. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

128. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

129. If a device is equipped with an iris recognition feature, a user may enable the ability to unlock the device through his or her irises. For example, Samsung offers an Iris Scanner, which uses the biometric information of an individuals' irises to identify the user.

130. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's

80

contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

131.  As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

132.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered within a certain period of time. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

133.  Due to the foregoing, with respect to any person who is located in the PREMISES during the execution of the search and who is reasonably believe by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of this warrant,  it is requested that law enforcement personnel may (1) press or swipe the fingers (including thumbs) of the person to the fingerprint scanner of the device found at the premises; or (2) hold the device in front of the

81

person's face to activate the facial and/or iris recognition features, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

134. Because several people share the TARGET LOCATIONS as a residence, it is possible that the TARGET LOCATIONS will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## VIII.    CONCLUSION

135. Based on the foregoing, I believe there is probable cause to believe that the following individuals are committing violations of federal law, including the Target Offenses: Dominique WILLIAMS; Malik NICHOLS; Jerald CAMPBELL; Devin EILAND; Anthony HANES; Charles BROWN; Andre MCKEE; Chauncey KING; Europe JAMES; and others yet un-identified. I further believe that there is probable cause to believe that located at and in the **TARGET PREMISES** described in Attachments A1-A10, there is evidence of the Target Offenses. Case agents believe there are currently documents and records showing dominion and control of the **TARGET PREMISES** and vehicles, cellular telephones, electronic devices, and other computers, and other evidence reflecting the targets' involvement in the offenses described above, located within the premises, vehicles, and persons described in Attachments A1-A10. For all of the foregoing reasons, I request authorization to search the premises, vehicles, and persons more fully described Attachments A1-A10 for the things described in Attachment B.

82

## ATTACHMENT A1
### *Location to be Searched*

4408 N 39th Street, Milwaukee, WI ("**Target Location 1**") is a single-story stone building with a gray shingle roof, and a west entry front door. The numerals 4408 are displayed to the left of the porch. The residence has a detached garage. This warrant authorizes the search of the residence and garage at this address. This warrant further authorizes law enforcement to compel persons found at this location to submit to the biometric-unlock procedures described in Attachment B.



## ATTACHMENT A2
### *Location to be Searched*

4414 N 39th Street, Milwaukee, WI ("**Target Location 2"**) is a single-story stone building with a brown shingle roof, and a west entry front door. The numerals 4414 are displayed to the right of the door on the front of the residence. The residence has a detached garage. This warrant authorizes the search of the residence and garage at this address. This warrant further authorizes law enforcement to compel persons found at this location to submit to the biometric-unlock procedures described in Attachment B.



**ATTACHMENT A3**
*Location to be Searched*

2857 N 26th Street, Milwaukee, WI ("**Target Location 3"**) is described as a single-story gray siding building with a gray shingle roof, and a east entry front door. The numerals 2857 are displayed above the door on the porch. The residence has a slab for parking in the rear of the residence. This warrant authorizes the search of the residence and garage at this address. This warrant further authorizes law enforcement to compel persons found at this location to submit to the biometric-unlock procedures described in Attachment B.



**ATTACHMENT A4**
*Location to be Searched*

1810 W Atkinson Avenue, Milwaukee, WI ("**Target Location 4")** is one of seemingly four street addresses associated with a two-story brick, multi-use building with a flat roof, and a south entry front door, and north entry rear door.  The numerals 1810 are displayed above the door on the archway.  The building seemingly has six (6) units on the second floor and one unit on the first floor with direct access to the rear stairwell. This warrant authorizes the search of all premises associated with this address. This warrant further authorizes law enforcement to compel persons found at this location to submit to the biometric-unlock procedures described in Attachment B.



## ATTACHMENT A5
### *Location to be Searched*

1702 W Capitol Drive, Milwaukee, WI ("**Target Location 5**") is the lower-unit of a 2.5-story brick and siding building with a brown shingle roof, and a southwest entry front door. The numerals 1702 are displayed to the left the door on the brick exterior. The residence has a detached garage. This warrant authorizes the search of the residence and garage associated with this address (i.e., the lower-unit and its garage). This warrant further authorizes law enforcement to compel persons found at this location to submit to the biometric-unlock procedures described in Attachment B.



## ATTACHMENT A6
### *Location to be Searched*

4462 N 40th Street, Milwaukee, WI ("**Target Location 6**") is a single-story brick and siding building with a gray shingle roof, and a southwest entry side door. The numerals 4462 are displayed to the right of the door affixed to the siding. The residence has a detached garage. This warrant authorizes the search of the residence and garage at this address. This warrant further authorizes law enforcement to compel persons found at this location to submit to the biometric-unlock procedures described in Attachment B.



# ATTACHMENT A7
## *Location to be Searched*

4466 N 40th Street, Milwaukee, WI ("Target Location 7") is a single-story brick building with a gray shingle roof, and a southwest entry side door. The numerals 4466 are displayed above the brick on the siding, just below the gutter line. The residence has a detached garage. This warrant authorizes the search of the residence and garage at this address. This warrant further authorizes law enforcement to compel persons found at this location to submit to the biometric-unlock procedures described in Attachment B.



## ATTACHMENT A8
### *Location to be Searched*

3840 Highway 60, Slinger, WI ("**Target Location 8**") is described as a single-story brick and siding building with a brown shingle roof, and a west entry front door. The residence has an attached garage. The premises also has a large outbuilding directly to the west and a barn to the north of the residence. This warrant authorizes the search of the residence, attached garage, barn, and outbuilding at this address. This warrant further authorizes law enforcement to compel persons found at this location to submit to the biometric-unlock procedures described in Attachment B.



<u>**ATTACHMENT A10**</u>
*Location to be Searched*

3665 W. College Ave, #64 Milwaukee, WI ("**Target Location 10**") is a two-story brick apartment building with a brown shingle roof, and multiple entry doors. The numerals 3665 are displayed to the side of the door affixed to the brick. Law enforcement understands that the units are delineated using numbers inside the building, including Unit #64, the Unit to be searched. This warrant further authorizes law enforcement to compel persons found at this location to submit to the biometric-unlock procedures described in Attachment B.



# ATTACHMENT B

## ITEMS TO BE SEIZED

1.      The items to be seized are evidence, contraband, fruits, records or instrumentalities relating to violations of Title 21, United States Code, Sections 841(a)(1) (Distribution and Possession with Intent to Distribute Controlled Substances), 846 (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances), and 843(b) (Use of Communications Facilities to Facilitate Controlled Substance Felonies); Title 18, United States Code, Section 922(g) (Felon-in-Possession of a Firearm); Title 18, United States Code, Section 922(o) (Possession of a Machine Gun); and Title 18, United States Code, Section 2(a) (Aiding and Abetting the Aforementioned Offenses (the "Subject Offenses"), from January 1, 2023, to the date of this warrant, namely:

       a.      Controlled substances and/or paraphernalia;

       b.      Packaging for controlled substances;

       c.      Drug ledgers and/or documentation;

       d.      Records and information relating utility bills, writings, cell phones, computers, receipts, notes, ledgers, receipts and/or other documentary evidence establishing who is in control of the premises;

       e.      Firearms, including pistols, handguns, shotguns, rifles, assault weapons, machine guns, magazines used to hold ammunition, silencers, components of firearms including laser sights and other components which can be used to modify firearms, ammunition and ammunition components, bulletproof vests, gun boxes and any and all documentation related to the purchase of such items;

f.      Records of off-site storage locations, including but not limited to safe deposit box keys and records, and records and receipts and rental agreements for storage facilities;

g.      Duffel, canvas bags, suitcases, safes, or other containers to hold or transport controlled substances and drug trafficking related items and proceeds;

h.      Bank account records, loan documents, wire transfer records, money order receipts, postal express mail envelopes, bank statements, safe deposit box keys and records, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the sale of controlled substances, or financial transactions related to the trafficking of controlled substances;

i.      Photographs, videotapes or other depictions of assets, firearms, coconspirators, or controlled substances; and,

j.      Records and information relating to the identity or location of Dominique WILLIAMS; Malik NICHOLS; Jerald CAMPBELL; Devin EILAND; Anthony HANES; Charles BROWN; Andre MCKEE; Chauncey KING; or Europe JAMES (the "Target Subjects").

2.      Any digital device which is itself or which contains evidence, contraband, fruits, records, or instrumentalities of the Subject Offenses, and forensic copies thereof.

3.      With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

a.      evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

93

b.      evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.      evidence of the attachment of other devices;

d.      evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.      evidence of the times the device was used;

f.      applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

g.      records of or information about Internet Protocol addresses used by the device.

4.      As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

5.      As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## SEARCH PROCEDURE FOR DIGITAL DEVICES

1.      In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.      Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.      The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.      The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of items to be seized.

ii.      The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.      The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.      The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

95

d.      If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.      If the search determines that a digital device does contain data falling within the scope of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.      If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the scope of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.      The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.      After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

2.      The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

3.      During the execution of this search warrant, law enforcement is permitted to: (1) depress the Target Subjects' thumbs and/or fingers onto the fingerprint sensor of the device (only

96

when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the Target Subjects' faces with their eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

4.      The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

5.      These warrants are being executed by the Milwaukee Area Safe Streets Task Force, which is comprised of both state, local, and federal law enforcement.

☑ Original   ☐ Dup 

CLERK'S OFFICE
A TRUE COPY
Oct 01, 2024
s/ D. Olszewski

Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

### for the

### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )   Case No.   24   MJ   190 |
| 2857 N 26th St, Milwaukee, WI 53206 ("Target | ) |
| Location 3"), as further described in | ) |
| Attachment A3 | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:   Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure
of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A3.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property
described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____October 14, 2024_____ *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the
person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the
property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory
as required by law and promptly return this warrant and inventory to _____Hon. William E. Duffin_____ .

*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose
property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   _____October 1, 2024 at 6:47 PM_____

*William E. Duffin*
*Judge's signature*

City and state:   _____Milwaukee, WI_____   Honorable William E. Duffin, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

2857 N 26th Street, Milwaukee, WI ("**Target Location 3"**) is described as a single-story gray siding building with a gray shingle roof, and a east entry front door. The numerals 2857 are displayed above the door on the porch. The residence has a slab for parking in the rear of the residence. This warrant authorizes the search of the residence and garage at this address. This warrant further authorizes law enforcement to compel persons found at this location to submit to the biometric-unlock procedures described in Attachment B.



1

# ATTACHMENT B

## ITEMS TO BE SEIZED

1. The items to be seized are evidence, contraband, fruits, records or instrumentalities relating to violations of Title 21, United States Code, Sections 841(a)(1) (Distribution and Possession with Intent to Distribute Controlled Substances), 846 (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances), and 843(b) (Use of Communications Facilities to Facilitate Controlled Substance Felonies); Title 18, United States Code, Section 922(g) (Felon-in-Possession of a Firearm); Title 18, United States Code, Section 922(o) (Possession of a Machine Gun); and Title 18, United States Code, Section 2(a) (Aiding and Abetting the Aforementioned Offenses (the "Subject Offenses"), from January 1, 2023, to the date of this warrant, namely:

a.      Controlled substances and/or paraphernalia;

b.      Packaging for controlled substances;

c.      Drug ledgers and/or documentation;

d.      Records and information relating utility bills, writings, cell phones, computers, receipts, notes, ledgers, receipts and/or other documentary evidence establishing who is in control of the premises;

e.      Firearms, including pistols, handguns, shotguns, rifles, assault weapons, machine guns, magazines used to hold ammunition, silencers, components of firearms including laser sights and other components which can be used to modify firearms, ammunition and ammunition components, bulletproof vests, gun boxes and any and all documentation related to the purchase of such items;

f. Records of off-site storage locations, including but not limited to safe deposit box keys and records, and records and receipts and rental agreements for storage facilities;

g. Duffel, canvas bags, suitcases, safes, or other containers to hold or transport controlled substances and drug trafficking related items and proceeds;

h. Bank account records, loan documents, wire transfer records, money order receipts, postal express mail envelopes, bank statements, safe deposit box keys and records, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the sale of controlled substances, or financial transactions related to the trafficking of controlled substances;

i. Photographs, videotapes or other depictions of assets, firearms, coconspirators, or controlled substances; and,

j. Records and information relating to the identity or location of Dominique WILLIAMS; Malik NICHOLS; Jerald CAMPBELL; Devin EILAND; Anthony HANES; Charles BROWN; Andre MCKEE; Chauncey KING; or Europe JAMES (the "Target Subjects").

2. Any digital device which is itself or which contains evidence, contraband, fruits, records, or instrumentalities of the Subject Offenses, and forensic copies thereof.

3. With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

a. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

3

b. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the attachment of other devices;

d. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e. evidence of the times the device was used;

f. applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

g. records of or information about Internet Protocol addresses used by the device.

4. As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

5. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

4

## SEARCH PROCEDURE FOR DIGITAL DEVICES

1.      In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.      Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.      The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.      The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of items to be seized.

ii.      The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.      The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.      The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

5

d.    If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.    If the search determines that a digital device does contain data falling within the scope of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the scope of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

2.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

3.    During the execution of this search warrant, law enforcement is permitted to: (1) depress the Target Subjects' thumbs and/or fingers onto the fingerprint sensor of the device (only

6

when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the Target Subjects' faces with their eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in <u>Graham v. Connor</u>, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

4.      The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

5.      These warrants are being executed by the Milwaukee Area Safe Streets Task Force, which is comprised of both state, local, and federal law enforcement.

7